No. 26-10482

# United States Court of Appeals for the Eleventh Circuit

NETAPP, INC.,

*Appellant*,

v.

JÓN THORGRÍMUR STEFÁNSSON,

*Appellee*.

On Appeal from the
United States District Court for the Middle District of Florida,
No. 6:25-cv-02130-JSS | Hon. Julie S. Sneed

**APPELLANT NETAPP, INC.'S OPENING BRIEF**


Elizabeth A. Kiernan
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
(214) 698-3100

Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Suite 1200
Irvine, CA 92612
(949) 451-3800
*bevanson@gibsondunn.com*

Aly Cox
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500

Katherine K. Vidal
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
(202) 282-5000

*Counsel for Appellant NetApp, Inc.*


March 20, 2026

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves Appellant NetApp, Inc.'s right to seek the protection of U.S. law in a U.S. forum in a dispute over its former employee's misappropriation of its trade secrets and confidential information and violation of his non-solicitation obligations in Florida. In dismissing this suit under the doctrine of *forum non conveniens* in favor of an Icelandic forum, the district court misinterpreted the parties' contracts to (mis)apply a forum-selection clause in a terminated agreement. NetApp, Inc. respectfully requests oral argument because it will significantly aid the Court in addressing the proper construction and application of the parties' contracts.

# TABLE OF CONTENTS

Page

Statement Regarding Oral Argument ..... i

Table of Citations ..... iv

Introduction ..... 1

Jurisdictional Statement ..... 7

Statement of the Issue ..... 8

Statement of the Case ..... 9

I. NetApp Develops and Protects Its Award-Winning First-Party Cloud Storage Service. ..... 9

II. NetApp Iceland Hires Stefánsson Who Agrees to Safeguard NetApp's Trade Secrets and Confidential Information. ..... 12

III. Stefánsson Terminates His Icelandic Employment Agreement Upon Moving to Florida to Join NetApp, Inc. ..... 15

IV. In Florida, Stefánsson Misappropriates NetApp's Confidential Information and Violates His Non-Solicitation Obligations. ..... 16

V. NetApp, Inc. Seeks to Enjoin Stefánsson from Misappropriating Its Trade Secrets and Confidential Information and Soliciting NetApp's Employees and Customers. ..... 21

Summary of the Argument ..... 24

Standard of Review ..... 28

Argument ..... 29

**TABLE OF CONTENTS**
**(continued)**

Page


I. The Terminated Employment Agreement Does Not Govern This Dispute. ..... 29

A. The Terminated Employment Agreement and the PIIA Were Not Integrated Contracts. ..... 30

B. The Icelandic Forum-Selection Clause Did Not Survive the Termination of the Employment Agreement. ..... 37

C. The Terminated Employment Agreement's Icelandic Forum-Selection Clause Does Not Apply to This Dispute. ..... 42

1. None of NetApp, Inc.'s Claims Fall Within the Scope of the Employment Agreement. ..... 43

2. The DTSA and FUTSA Claims Fall Outside the Scope of Both Agreements. ..... 46

3. The District Court Disregarded Defined Terms. ..... 48

II. Dismissal for *Forum Non Conveniens* Was Unwarranted. ..... 51

A. Stefánsson Did Not (and Cannot) Show Extreme Circumstances Overcoming NetApp, Inc.'s Choice of Venue. ..... 52

B. It Would Be Unreasonable and Unjust to Apply the Employment Agreement's Mandatory Forum-Selection Clause as to the DTSA and FUTSA Claims. ..... 57

Conclusion ..... 60

Certificate of Compliance ..... 61

Certificate of Service ..... 62

## TABLE OF CITATIONS

Page(s)

### Cases

*Alamo Fin., L.P. v. Mazoff*,
112 So. 3d 626 (Fla. Dist. Ct. App. 2013)....................34

*AQuate II LLC v. Myers*,
100 F.4th 1316 (11th Cir. 2024)....................28, 29, 58

*Arciniaga v. Gen. Motors Corp.*,
460 F.3d 231 (2d Cir. 2006)....................35

*Bahamas Sales Assoc., LLC v. Byers*,
701 F.3d 1335 (11th Cir. 2012)....................26, 29, 43

*Bailey v. ERG Enters., LP*,
705 F.3d 1311 (11th Cir. 2013)....................29

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*,
2019 WL 2017541 (E.D. Va. May 7, 2019)....................39

*Cardoso v. Coelho*,
596 F. App'x 884 (11th Cir. 2015)....................12, 52, 53

*Compulife Software Inc. v. Newman*,
959 F.3d 1288 (11th Cir. 2020)....................45

*DVDPlay, Inc. v. DVD 123 LLC*,
930 So. 2d 816 (Fla. Dist. Ct. App. 2006)....................39

*Engle Homes, Inc. v. Jones*,
870 So. 2d 908 (Fla. Dist. Ct. App. 2004)....................40

*Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*,
556 F.3d 1232 (11th Cir. 2009)....................4, 26, 33, 41, 49

**TABLE OF CITATIONS**
**(continued)**

Page(s)

*Esfeld v. Costa Crociere, S.P.A.*,
289 F.3d 1300 (11th Cir. 2002) .......... 56

*Fla. Inv. Grp. 100, LLC v. Lafont*,
271 So. 3d 1 (Fla. Dist. Ct. App. 2019) .......... 44

*Fla. PACE Funding Agency v. Pinellas County*,
385 So. 3d 631 (Fla. Dist. Ct. App. 2024) .......... 42

*Fla. Recycling Servs., Inc. v. Greater Orlando Auto Auction, Inc.*,
898 So. 2d 129 (Fla. Dist. Ct. App. 2005) .......... 48

*In re Gardinier, Inc.*,
831 F.2d 974 (11th Cir. 1987) .......... 25, 30, 32, 34, 36

*Gold Crown Resort Mktg. Inc. v. Phillpotts*,
272 So. 3d 789 (Fla. Dist. Ct. App. 2019) .......... 48

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947) .......... 55, 57

*Harvey as Tr. of Russel A. Schlegel Revocable Living Tr. v. Lifespace Comms., Inc.*,
306 So. 3d 1248 (Fla. Dist. Ct. App. 2020) .......... 31

*Hightower Holding, LLC v. Kedir*,
2024 WL 3398361 (N.D. Ill. July 11, 2024) .......... 47

*Ibis Lakes Homeowners Ass'n, Inc. v. Ibis Isle Homeowners Ass'n, Inc.*,
102 So. 3d 722 (Fla. Dist. Ct. App. 2012) .......... 50

*Inlet Beach Cap. Invs., LLC v. F.D.I.C.*,
778 F.3d 904 (11th Cir. 2014) .......... 49

**TABLE OF CITATIONS**
**(continued)**

Page(s)

*Junction Sols., LLC v. MBS DEV, Inc.*,
2007 WL 114306 (N.D. Ill. Jan. 9, 2007).......................................... 39

*Kel Homes, LLC v. Burris*,
933 So. 2d 699 (Fla. Dist. Ct. App. 2006).......................................... 50

*King v. Cessna Aircraft Co.*,
562 F.3d 1374 (11th Cir. 2009)................................................................ 7

*Lallouz v. D.E.T. Card, L.C.*,
724 So. 2d 157 (Fla. Dist. Ct. App. 1998).......................................... 33

*Lee v. Cercoa, Inc.*,
433 So. 2d 1 (Fla. Dist. Ct. App. 1983)............................................... 47

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972)....................................................................................... 59

*Marchisio v. Carrington Mortg. Servs., LLC*,
919 F.3d 1288 (11th Cir. 2019).............................................................. 50

*Milstein v. Nicklaus*,
412 So. 3d 802 (Fla. Dist. Ct. App. 2025)............................... 33, 36, 43

*Monarch Claims Consultants, Inc. v. Fleming*,
372 So. 3d 758 (Fla. Dist. Ct. App. 2023).................................... 28, 58

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
108 F.4th 458 (7th Cir. 2024) ................................................................ 58

*Muzumdar v. Wellness Int'l Network, Ltd.*,
438 F.3d 759 (7th Cir. 2006).................................................................. 49

*Otto Candies, LLC v. Citigroup, Inc.*,
963 F.3d 1331 (11th Cir. 2020).................................. 28, 53, 54, 55, 59

**TABLE OF CITATIONS**
**(continued)**

Page(s)

*Parrish v. State Farm Fla. Ins. Co.*,
356 So. 3d 771 (Fla. 2023) .................... 39

*Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*,
2022 WL 6635136 (11th Cir. Oct. 11, 2022).................... 44

*Polyflow, LLC v. Specialty RTP, LLC*,
2016 WL 6909383 (S.D. Tex. May 17, 2016).................... 39

*Romano v. John Hancock Life Ins. Co. (USA)*,
120 F.4th 729 (11th Cir. 2024) .................... 38

*SE Prop. Holdings, LLC v. Welch*,
65 F.4th 1335 (11th Cir. 2023) .................... 34

*Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*,
641 F. App'x 849 (11th Cir. 2016) .................... 41, 42

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007).................... 54

*SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*,
382 F.3d 1097 (11th Cir. 2004).................... 54, 57

*Snapper, Inc. v. Redan*,
171 F.3d 1249 (11th Cir. 1999).................... 52

*Travelers Indem. Co. of Conn. v. Richard Mckenzie & Sons, Inc.*,
10 F.4th 1255 (11th Cir. 2021) .................... 40

*TSI USA, LLC v. Uber Techs., Inc.*,
2017 WL 106835 (N.D. Tex. Jan. 11, 2017) .................... 39

**TABLE OF CITATIONS**
**(continued)**

Page(s)

*U.S. Smoke & Fire Curtain, LLC v. Bradley Lomas Electrolok, Ltd.*, 612 F. App'x 671 (4th Cir. 2015) .......... 40

*Werner Enters., Inc. v. Mendez*, 362 So. 3d 278 (Fla. Dist. Ct. App. 2023) .......... 46

**Statutes**

18 U.S.C. § 1839 .......... 46, 47

28 U.S.C. § 1291 .......... 7

28 U.S.C. § 1331 .......... 7

28 U.S.C. § 1367 .......... 7

28 U.S.C. § 1391 .......... 53

Defend Trade Secrets Act of 2016, Pub. L. 114-153, § 5, 130 Stat. 376 (2016) .......... 57, 59

Fla. Stat. Ann. § 542.335 .......... 21

Fla. Stat. Ann. § 688.002 .......... 46, 47

**Rules**

Fed. R. App. P. 4 .......... 7

Fed. R. Civ. P. 65 .......... 22

**TABLE OF CITATIONS**
**(continued)**

Page(s)

## Other Authorities

Nicole Hemsoth Prickett,
*Extending the Vast AI OS Across Hybrid Multicloud Infrastructure*,
VAST (Feb. 25, 2026) .......... 20

*Office Space* (20th Century Fox 1999) .......... 17

## INTRODUCTION

While working in Florida for U.S.-based company NetApp, Inc., Defendant-Appellee Jón Thorgrímur Stefánsson violated Florida and federal law by misappropriating the company's trade secrets and violating his non-solicitation obligations. Yet the district court dismissed this suit in favor of an Icelandic forum based on a forum-selection clause in an inapplicable employment agreement that the parties terminated almost three years before this suit was filed. That cannot be right, and the terms of the parties' agreements make clear it is not.

Plaintiff-Appellant NetApp, Inc. and its affiliates (collectively, "NetApp") are the leading providers of high-performance data management and cloud services—revolutionizing the industry by becoming the first to offer public cloud storage services with the ability to be natively integrated with all three major cloud-based providers (Amazon, Google, and Microsoft).

To protect this unique and valuable technology, NetApp, Inc. and its affiliates require all employees to execute an agreement to maintain the secrecy of their trade secrets. And because employees sometimes

move among the NetApp suite of companies, that agreement—the Proprietary Information, Inventions, and Non-Solicitation Agreement ("PIIA")—follows the employee to whichever of the NetApp entities employs him. The PIIA further provides a floating mandatory choice-of-law clause (tying governing law to the location of the breach) and a permissive forum-selection clause.

Some NetApp employees also sign employment agreements, though this is not standard procedure across NetApp entities. Those employed by NetApp, Inc., for example, are considered at-will employees under U.S. law and do not sign any employment agreement. But those employed by a foreign affiliate (like NetApp Iceland ehf) may sign such an agreement to comply with local law. Accordingly, the agreement focuses on that employee's specific relationship with the NetApp entity employing it and provides various rights as required by the local jurisdiction. To that end, the employment agreement may also select a local forum and local laws for any disputes over its terms. And, because it is unique to the particular NetApp entity for whom the employee works, the agreement is not designed to follow an employee should he transfer within the NetApp family. For that reason, when Stefánsson requested a transfer from

NetApp Iceland to U.S.-based NetApp, Inc. over three years ago, the parties expressly terminated his Icelandic employment agreement.

While working in Florida as Senior Vice President and Chief Technology Officer for NetApp, Inc., Stefánsson became dissatisfied with his job. So he decided to secretly launch his own venture and solicited other NetApp employees to exploit their knowledge of NetApp's industry-leading technology and customer relationships. While still employed by NetApp entities, they began designing their own cloud platforms and downloading confidential information from NetApp servers to their personal laptops.

Armed with technology that NetApp spent years and millions of dollars creating, Stefánsson left NetApp, Inc. That same week, he incorporated his own company and hired the NetApp employees with whom he had been conspiring. Ten weeks later, he sold that company, and the technology it designed using NetApp's proprietary information, to NetApp, Inc.'s direct competitor (VAST Data). And then he and the other former NetApp employees accepted employment with VAST Data to help it capitalize on that stolen technology to compete with NetApp for its critical customers.

By doing so, Stefánsson violated the Defend Trade Secrets Act, the Florida Uniform Trade Secrets Act, and his operative confidentiality and non-solicitation obligations under the PIIA. NetApp, Inc. thus filed suit on these grounds and sought preliminary relief to protect its proprietary information and guard against the unlawful solicitation of its customers and employees. Neither NetApp, Inc.'s complaint nor its request for a temporary restraining order invoked (or even mentioned) the terminated Icelandic employment agreement.

Stefánsson responded by asserting the Icelandic forum-selection clause from his terminated employment agreement with NetApp Iceland. The district court agreed, concluding that the parties intended for the two contracts to be integrated for all purposes even after termination of the Icelandic employment agreement.

The district court misinterpreted the agreements and effectively treated the PIIA's permissive forum-selection agreement as mere surplusage in contradiction of this Court's direction to afford all contractual provisions meaning. *See Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1242 (11th Cir. 2009). The two agreements are not only different in scope and purpose, but also explicitly

*define* themselves as separate agreements. And even if the agreements were "integrated" at one point, any integration ceased when Stefánsson moved to Florida and terminated (in writing) his agreement with NetApp Iceland.

The very forum-selection clause that Stefánsson invokes makes clear that it applies only to disputes implicating the "construction, performance, interpretation and validity of *this Agreement*"—a term the contract defines as "this Employment Contract." Dkt. 36-2 §§ 1.2, 20.7 (emphasis added). NetApp, Inc.'s claims under the PIIA do not require the construction, performance, interpretation, or validity of the employment agreement. And NetApp, Inc.'s statutory claims for misappropriation do not necessarily turn on either of the agreements Stefánsson signed; they are not subject to *any* forum-selection clause.

All paths lead to one conclusion: the Icelandic forum-selection clause in a terminated Icelandic employment agreement is operable only with respect to claims on that employment agreement. But NetApp asserts no such claim here. The Icelandic forum-selection clause has no bearing on the proper forum for the dispute here between Stefánsson and his U.S. employer over his misconduct in Florida, in violation of Florida

and U.S. law as well as the separate PIIA. The district court thus erred by relying on the employment agreement's forum-selection clause to dismiss this suit under the doctrine of *forum non conveniens*. This Court should reverse that decision and reinstate NetApp, Inc.'s suit.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the laws of the United States and supplemental jurisdiction under 28 U.S.C. § 1367 over all other claims. Dkt. 1 ¶ 19. The district court entered a final order dismissing NetApp, Inc.'s complaint under the doctrine of *forum non conveniens* on January 30, 2026. Dkt. 142. NetApp, Inc. timely noticed its appeal on February 11, 2026. Dkt. 147; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because dismissal for *forum non conveniens* constitutes a final, appealable order. *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1379 (11th Cir. 2009).

## STATEMENT OF THE ISSUE

Whether the district court erred by dismissing this suit under the doctrine of *forum non conveniens* based on a forum-selection clause that by its plain terms does not apply to this suit and was terminated years before the conduct at issue.

## STATEMENT OF THE CASE

### I. NetApp Develops and Protects Its Award-Winning First-Party Cloud Storage Service.

NetApp is a global leader in cloud data management and storage solutions, helping organizations store, manage, and protect their data across hybrid and multi-cloud environments. Dkt. 1 ¶ 4. NetApp develops, maintains, and uses confidential information and trade secrets, including information relating to its cloud control plane and service delivery engine, first-party cloud storage services and partnerships, and cloud solutions for hyperscalers like Amazon, Google, and Microsoft. *Id.*[1] This award-winning cloud control plane and sophisticated service delivery engine allows customers to manage their data from hyperscalers' native interfaces—technology central to NetApp's competitive advantage. Dkt. 141 at 4.

That ingenuity was the product of years of hard work and investment. Even with a large team of engineers and tens of millions of dollars, it took roughly four years to achieve NetApp's first-party offering with

[1] A hyperscaler is a "large, cloud-based provider—such as Amazon Web Services ('AWS'), Google Cloud, or Microsoft Azure—that offers enterprises on-demand, highly-scalable computing infrastructure and networking services." Dkt. 1 ¶ 4 n.3 (citation omitted).

Microsoft. Dkt. 141 at 4–5. It took even more time and money to integrate with the other two major hyperscalers, Amazon and Google. *Id.* at 5. And when it did, it became the first data management company to natively integrate its operating system across all three of Microsoft, Amazon, and Google. Dkt. 1 ¶ 22.

The value of this industry-leading technology and information thus depends on its secrecy and on NetApp's continued ability to prevent its public disclosure or use by competitors. Dkt. 141 at 5. If a direct competitor were to access or use these trade secrets, it could replicate NetApp's offering in a dramatically accelerated timeframe—undercutting NetApp's market leadership and harming sales. *Id.*

To protect its intellectual property, NetApp requires that all of its employees sign a Proprietary Information, Inventions, and Non-Solicitation Agreement ("PIIA"). Dkt. 66-4 ¶ 3; Dkt. 1 ¶ 5. That agreement applies across all of NetApp's family of companies, follows the employee if he moves among the family, and continues after the employee leaves NetApp. Dkt. 1-2 (Preamble). Under the PIIA, an employee:

- cannot use trade secrets or intellectual property belonging to NetApp without consent;

- must disclose all inventions conceived of, created, or developed during his employment term (as those inventions belong to the company);
- must disclose all inventions conceived of, created, or developed within six months of the end of his employment term;
- cannot solicit current or prospective customers or business partners; and
- cannot solicit or induce any NetApp employee to leave NetApp or render services for the benefit of another company.

*Id.* §§ B, C.1, C.2, G, H. For U.S.-based employees, the PIIA further explains the safe-harbors under the Defend Trade Secrets Act ("DTSA") for disclosures to law enforcement or for purposes of legal representation. *Id.* § B.

Because the obligations follow the employee even if he "transfer[s] [his] employment at any time . . . to another subsidiary or affiliate of the Company" or leaves the company altogether, the PIIA also provides for a floating governing-law and forum-selection clause, *i.e.*, one that follows the employee to his location of employment. *Id.* (Preamble); *id.* § O. That clause mandates that any breach be enforced "in accordance with the laws of the state or country of the location in which [the employee] work[ed] as of the date of the occurrence of the breach." *Id.* § O. And it

includes a permissive forum-selection clause, which requires the employee "consent to the personal jurisdiction and venue in the state and federal courts of the country and county of the location in which [he] work[ed] as of the date hereof for any lawsuit filed there against me by the Company arising from or related to this Agreement." *Id.*[2]

## II. NetApp Iceland Hires Stefánsson Who Agrees to Safeguard NetApp's Trade Secrets and Confidential Information.

In 2017, NetApp acquired Greenqloud, an Icelandic company that had developed a cloud-services-orchestration and management platform for hybrid-cloud and multi-cloud environments. Dkt. 1 ¶ 25; Dkt. 3-3 ¶ 3. Upon acquisition, Greenqloud became NetApp Iceland ehf. *See* Dkt. 36-2 at 1; Dkt. 36-4 at 1.

To help integrate Greenqloud's and NetApp's technology, NetApp Iceland hired several former Greenqloud employees, including its CEO

[2] Before the district court, the parties disputed whether the term "hereof" referred to the location the PIIA is signed in or the location the employee works as of the date of the breach. *See* Dkt. 142 at 24–27 (discussing the import of the term "hereof" in the PIIA's forum-selection clause). That dispute is ultimately immaterial here; even if the PIIA *permits* venue in the place the PIIA is initially signed, it does not (like a mandatory clause) "*foreclose* litigation in an alternative forum." *Cardoso v. Coelho*, 596 F. App'x 884, 886 (11th Cir. 2015) (emphasis added).

Stefánsson. Stefánsson assumed the role of "VP of Cloud Services," making him responsible for "[s]trong, effective executive leadership of NetApp's Iceland entity." Dkt. 36-2 § 2.1. At the initiation of Stefánsson's tenure, he signed two agreements: (1) the standard PIIA, and (2) an Icelandic employment agreement. Dkt. 1-2 (PIIA); Dkt. 36-2 (employment agreement); Dkt. 66 at 2.

**PIIA.** As with all NetApp employees, Stefánsson's employment with NetApp Iceland was "contingent" on his signing of NetApp's standard PIIA. Dkt. 1-2 (Preamble). By doing so, he agreed not to use or disclose NetApp's confidential information or trade secrets, to disclose all inventions created during or in the six months following his employment, and to refrain from soliciting NetApp's customers and employees for a year following his employment. *Id.* §§ B, C.1, C.2, G, H.

**Employment Agreement.** Stefánsson also signed an employment agreement with NetApp Iceland. Unlike the PIIA, not every NetApp entity requires employees to sign an employment agreement. U.S.-based employees do not sign an employment agreement because they are considered "at-will and the terms of their employment can change at any time." Dkt. 66-4 ¶ 2. But in order to be "consistent with Icelandic labor

laws," a formal agreement was necessary for Stefánsson's employment with NetApp Iceland. Dkt. 66-5 ¶ 3; *see* Dkt. 36-2 § 1.3. So the employment agreement set forth Stefánsson's rights and obligations as an Icelandic employee of NetApp Iceland.

For example, it made clear that, consistent with Icelandic law, he had the right to "11 hours of rest between shifts," "public holidays consistent with local law," "minimum premium paid to a pension fund," "[v]acation rights," paid sick leave, "parental leave," and "notice of termination of employment." Dkt. 36-2 §§ 3.1–4, 8–11. Because the employment agreement provided for Icelandic employment and Icelandic rights, the parties (unsurprisingly) agreed that the "construction, performance, interpretation and validity of *this Agreement* will be governed by and construed in accordance with the laws of Iceland and will be subject to the exclusive jurisdiction of the courts of Iceland." *Id.* § 20.7 (emphasis added). The parties defined "Agreement" as "this Employment Contract." *Id.* § 1.2.

The employment agreement further reinforced that Stefánsson must "comply with" the PIIA, his employment being "contingent" on his signing of the PIIA. *Id.* §§ 12, 19.2; *id.* § 14.3 (requiring Stefánsson to

"sign the PIIA, which forms an integral part of this Agreement"). The agreement defined Stefánsson's confidentiality obligations by reference to the PIIA. *Id.* § 12.1. It reiterated that Stefánsson could not solicit any employee or customer of, nor compete with, NetApp Iceland. And it made clear that only Stefánsson's confidentiality, non-solicitation, and non-compete obligations "shall survive termination of the [Employment] Agreement." *Id.* §§ 12.2, 14.2; *see also id.* § 13.1.

## III. Stefánsson Terminates His Icelandic Employment Agreement Upon Moving to Florida to Join NetApp, Inc.

After serving as NetApp Iceland's Vice President for nearly five years, Stefánsson became dissatisfied with that role. Dkt. 41-2. So in spring 2022, Stefánsson claimed he had job offers from other U.S.-based companies and leveraged those purported offers for "a promotion to SVP [Senior Vice President] and a big salary bump." *Id.* As part of this promotion, Stefánsson would transfer to the U.S.-based NetApp, Inc. Dkt. 1 ¶ 4. Thus, Stefánsson and NetApp Iceland terminated the Icelandic "employment contract" by "mutual consent" on December 31, 2022. Dkt. 36-4 at 1.

Stefánsson then moved to and purchased a home in Orlando, Florida, and became Chief Technology Officer and Senior Vice President of

NetApp, Inc. Dkt. 1 ¶ 4. Because U.S.-based employees can be considered "at will" under U.S. law without a formal contract, Stefánsson did not sign a new employment agreement at that time. *See* Dkt. 66-4 ¶ 2. However, as provided by its plain terms, the PIIA followed Stefánsson to his new job with NetApp, Inc. in Florida. Dkt. 1-2 (Preamble); Dkt. 66-4 ¶ 4; Dkt. 66-5 ¶ 5.

## IV. In Florida, Stefánsson Misappropriates NetApp's Confidential Information and Violates His Non-Solicitation Obligations.

During his eight years with NetApp, Stefánsson assumed various roles that gave him deep insight into NetApp's critical cloud business, including NetApp's first-party cloud-storage business, hyperscaler partners, engineering-design decisions, key relationships, and long-term strategic goals. Dkt. 1 ¶¶ 8–9; Dkt. 3-3 ¶¶ 4–9. By his own admission, he had become "incredibly important" to the "cloud engineering and pivotal business development projects with major public clouds, Amazon, Google, and Microsoft," with access to NetApp's trade secrets, source code, engineering documents, and sales information. Dkt 126 at 182:23–183:1.

While working for NetApp, Inc. in Florida, Stefánsson exploited that critical knowledge of NetApp's trade secrets and confidential information to secretly launch a new venture (named Red Stapler) with other NetApp employees. Dkt. 1 ¶¶ 4, 6–8, 30–39.[3] For example, Stefánsson exfiltrated data by syncing confidential NetApp materials to his personal iCloud account, including documents stamped "Confidential" or "NetApp Confidential." Dkt. 126 at 70:17–19, 71:11–25. Stefánsson took documents about NetApp's strategic customers (like Chevron and the NFL) and a three-year roadmap of product features NetApp intended to implement for its hyperscaler partners. Dkt. 141 at 11–12. He uploaded hundreds of screenshots from his NetApp-issued laptop to his personal iCloud. Dkt. 126 at 71:5–10.

Further, though NetApp owns anything created during their employment, Stefánsson and his team secretly used a Red Stapler GitHub

[3] "Red Stapler" is a reference to the cult classic *Office Space* (20th Century Fox 1999), a comedy about three disgruntled software engineers of a high-tech company who ineptly embezzle money, and who manage to escape detection only because a different disaffected employee (who is obsessed with a red stapler) fortuitously burns down the company headquarters. Naming the company "Red Stapler" was an obvious expression of Stefánsson's contempt for NetApp.

repository to hold their cloud extensibility experiments, Kubernetes configurations, an architectural "skeleton," and "open-source application configurations" (*i.e.*, code). *Id.* at 249:11, 251:8–13; *see* Dkt. 1-2 § C.1. And he participated in a Facebook group chat with his team (while employed by NetApp) to discuss their meetings with VAST Data, how they were using their NetApp agreements as templates for their future employment agreements, and that they should fire each other instead of quitting to try to circumvent some of their contractual obligations to NetApp. *E.g.*, Dkt. 15 at 3–4; Dkt. 15-2 at 9–10, 39–43, 49 (Facebook thread).

That misconduct is likely just the tip of the iceberg, as Stefánsson and members of his Red Stapler team attempted to cover their tracks. In the Facebook chat, Stefánsson agreed with another team member's caution not to "download to NetApp computers" their future employment agreements. Dkt. 15-2 at 49–51. On the date of his resignation, Stefánsson deleted 722 files and seven Google Chrome profiles before returning his work laptop to NetApp—deleting 682 files on the date of his resignation alone—thereby impeding NetApp's forensics team in its attempts to

confirm which data he copied to personal storage clouds or email accounts. Dkt. 141 at 12; Dkt. 126 at 69:10–17, 72:16–20. Although forensics show that Stefánsson synced files to his personal iCloud account, NetApp's forensic investigators have not been able to recover the content of some documents. Dkt. 126 at 107:13–20, 108:21–109:5. Stefánsson's Red Stapler team similarly covered up their activity before returning their company devices and terminating their employment: two reset their devices to factory settings and another transferred the bulk of his NetApp user profile to an external hard drive. Dkt. 141 at 9.

With these preparations in place, Stefánsson and his Red Stapler team of NetApp employees left NetApp, Inc. in June 2025. Dkt. 1 ¶ 36. That same week, Stefánsson incorporated "Red Stapler" in Iceland. *Id.* And, just 10 weeks later, on September 9, 2025, Stefánsson announced the sale of Red Stapler to VAST Data, NetApp's direct competitor. *Id.* ¶¶ 37–39. That deal included the transfer of NetApp's proprietary information and provided for the employment of NetApp's former employees, including Stefánsson. *See id.* ¶ 38. Stefánsson assumed the role of "General Manager of Cloud Solutions to lead [VAST Data's] hyperscale cloud

strategy," a role that will necessarily require soliciting hyperscaler partners, in violation of the PIIA's one-year non-solicitation prohibition. *See* Dkt. 119-4; Dkt. 141 at 18–19.

Upon acquiring Red Stapler, VAST Data publicly announced that the acquisition included "[Red Stapler's] cloud control plane and service delivery platform"—which Stefánsson copied while doubly-employed by NetApp and Red Stapler and which is the very technology that NetApp spent years and tens of millions of dollars developing. Dkt. 1 ¶¶ 8–9; Dkt. 141 at 1. Stefánsson contemporaneously confirmed in response to press inquiries that the deal involved the sale of technology, referencing the sale of "the Polaris [extensible] delivery service platform IP." Dkt. 126 at 196:17–198:7. And despite Stefánsson telling the district court that "Polaris" was still in its "infancy" when VAST Data acquired Red Stapler (*id.* at 264:6–10), VAST Data announced, just months later, the launch of "Polaris," a "centralized control plane" that operates "across hybrid and multicloud environments" (Nicole Hemsoth Prickett, *Extending the Vast AI OS Across Hybrid Multicloud Infrastructure*, VAST (Feb. 25, 2026), https://perma.cc/95RR-CWJU).

## V. NetApp, Inc. Seeks to Enjoin Stefánsson from Misappropriating Its Trade Secrets and Confidential Information and Soliciting NetApp's Employees and Customers.

When it learned of Stefánsson's actions, NetApp, Inc. took prompt action to protect its rights and trade secrets: It sent cease-and-desist letters to Stefánsson (Dkt. 3-9); filed a complaint alleging violations of the DTSA, the Florida Uniform Trade Secrets Act ("FUTSA"), and the PIIA (Dkt. 1); and moved for a temporary restraining order under the DTSA, the FUTSA, and Florida Statute § 542.335 (which governs the enforcement of restrictive covenants, like the PIIA) in the Middle District of Florida on November 6, 2025 (Dkt. 3).

The district court granted a temporary restraining order. Dkt. 13. It concluded that NetApp, Inc. had shown a substantial likelihood of success on the merits of its DTSA and FUTSA claims, and that "disclosure of" its confidential information and trade secrets "would result in irreparable harm." *Id.* at 7–12. NetApp, Inc. then moved to convert the temporary restraining order into a preliminary injunction. Dkt. 15.[4]

[4] As a matter of law, absent the parties' agreement, a temporary restraining order can be in place only for 14 days, with one extension of a "like

In the meantime, Stefánsson filed a motion to dismiss. He argued that he was not subject to personal jurisdiction in Florida and that the district court should apply the terminated employment agreement's Icelandic forum-selection clause to dismiss the complaint under the doctrine of *forum non conveniens*. *See* Dkt. 36. He contended that the Icelandic forum-selection clause applied, notwithstanding the termination of the employment agreement, because "the Employment Agreement and PIIA constitute a single, integrated agreement" based on the fact that they were "executed contemporaneously" and that the employment agreement references the PIIA. *Id.* at 8.

NetApp, Inc. explained in opposition that it had personally served Stefánsson in Florida (twice), that the PIIA upon which it sued had its own permissive forum-selection clause, and that the parties terminated Stefánsson's original employment agreement selecting an Icelandic forum when Stefánsson resigned from NetApp Iceland and moved to the

---

period." Fed. R. Civ. P. 65(b)(2). The district court extended the temporary restraining order here another 14 days while the parties briefed the motion to convert. Dkt. 25. Once that period expired, the court could not further extend the temporary restraining order.

United States as part of his promotion to Senior Vice President of NetApp, Inc. *See* Dkt. 66.

At the evidentiary hearing on the motion for preliminary injunction, NetApp, Inc. produced substantial evidence of Stefánsson's ongoing misappropriation of NetApp's trade secrets and solicitation of its employees and clients. *See, e.g.*, Dkt. 119; Dkt. 126; Dkt. 141. As described, Stefánsson downloaded confidential NetApp information to his personal iCloud account, (somehow) created and sold a platform in 10 weeks that was similar to the one that took NetApp several years to develop, and accepted employment with NetApp's direct competitor. *Supra* Background Part IV.

But after the hearing, without ruling on NetApp's preliminary injunction motion, the district court granted Stefánsson's motion to dismiss. *See* Dkt. 142. Although the district court held that it had personal jurisdiction, it concluded that the defunct forum-selection clause from Stefánsson's Icelandic employment agreement governed NetApp, Inc.'s statutory and PIIA claims, because the employment agreement and the PIIA must be "construed together as a single contract." *Id.* 17–19.

Based on this erroneous construction, the district court held that the mandatory, Icelandic forum-selection clause from the terminated employment agreement applied to disputes arising under the PIIA. *Id.* at 22–31. And that error caused the district court to shift the burden from Stefánsson to NetApp, Inc., requiring NetApp, Inc. to overcome the mandatory Icelandic forum-selection clause. *Id.* at 31–40. Holding NetApp, Inc. had not met that burden, the district court dismissed all claims without prejudice for *forum non conveniens*. *Id.* at 40. And it directed the clerk to terminate all pending motions, including NetApp, Inc.'s motion for a preliminary injunction. *Id.*

NetApp, Inc. promptly noticed its appeal on February 11, 2026. Dkt. 147.

## SUMMARY OF THE ARGUMENT

The district court made two fundamental errors in dismissing this suit arising out of a Florida employee's misappropriation of proprietary information under the doctrine of *forum non conveniens* based on a mandatory Icelandic forum-selection clause in a terminated employment agreement with his former Icelandic employer.

**I.** The Icelandic forum-selection clause in the terminated employment agreement does not apply to the claims in this dispute for several independent reasons: **(A)** the PIIA and the employment agreement were not integrated contracts; **(B)** the parties terminated the employment agreement (and its forum-selection clause) in all events; and **(C)** the claims asserted in this suit fall outside the plain terms of the Icelandic forum-selection clause, regardless.

**A.** The employment agreement and the PIIA are not "integrated" contracts. Although both relate to aspects of Stefánsson's employment with NetApp, "the nature and purpose of the agreements are different." *In re Gardinier, Inc.*, 831 F.2d 974, 976 (11th Cir. 1987). The PIIA was tailored to apply across all NetApp companies and float among Stefánsson's employment with the same. The employment agreement, on the other hand, was tailored to his role with NetApp Iceland, setting forth his duties as VP of Cloud Services and his entitlement to workers' rights as defined by Icelandic law. These are separate agreements, such that the defunct Icelandic employment agreement has no bearing on the choice of forum for a dispute over Florida and U.S. law or for a breach of the PIIA.

**B.** Even if the employment agreement and the PIIA were "integrated" at one point, the parties *terminated* the employment agreement (but not the PIIA) upon Stefánsson's move to Florida to work for NetApp, Inc. Reading the terminated employment agreement's forum-selection clause to survive and apply over the PIIA's forum-selection clause would violate multiple tenets of contract construction: to afford the text its plain meaning, to give effect to all provisions, and to construe the text as a whole to effectuate the parties' intent. *Equity Lifestyle*, 556 F.3d at 1242.

**C.** Even if the forum-selection clause in the employment agreement survives the agreement's termination, it would still not warrant dismissal of NetApp, Inc.'s claims here because the claims NetApp, Inc. asserted in this suit fall outside the scope of the Icelandic forum-selection clause in any event. *See Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1340 (11th Cir. 2012). The employment agreement's forum-selection clause applies only to disputes over the "construction, performance, interpretation and validity of *this Agreement*"—a term the employment agreement defines as "this Employment Contract." Dkt. 36-2 §§ 1.2, 20.7

(emphasis added). NetApp, Inc. does not assert a claim under the Icelandic employment agreement, so its forum-selection clause is entirely irrelevant. And even if it could capture claims under the PIIA, it does not capture NetApp, Inc.'s statutory trade-secret claims—which can turn on Stefánsson's theft, misuse, and disclosure of NetApp, Inc.'s trade secrets independent of any contract.

**II.** Once the employment agreement is set aside as irrelevant, it is clear that Stefánsson did not carry his burden to obtain dismissal on the basis of *forum non conveniens*. And even if the employment agreement's forum-selection clause applies here, the district court still should not have dismissed the DTSA and FUTSA claims, as NetApp, Inc. cannot pursue all remedies available under those statutes in an Icelandic court.

**A.** The district court's erroneous conclusion that the mandatory Icelandic forum-selection clause applied had a domino effect: It caused it to place a thumb on the scale in favor of dismissing for *forum non conveniens* and thus put the burden on NetApp, Inc. to overcome that selection. But once that conclusion is reversed, only the PIIA's *permissive* forum-selection clause is left, and the burden is put back on Stefánsson to overcome the presumption favoring a U.S. forum for a U.S. plaintiff over

misconduct centered in Florida. *Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1339 (11th Cir. 2020). Stefánsson did not (and cannot) carry that burden. After all, forcing Stefánsson to defend in a Florida forum the actions he took while working in Florida for a U.S. company is hardly the kind of extreme circumstances this court usually requires to oust a plaintiff from its chosen forum.

**B.** At minimum, even if the employment agreement's mandatory selection of Iceland applied, the district court still should have set it aside with regard to the DTSA and FUTSA claims. NetApp, Inc. cannot pursue all of the remedies available to it under the DTSA and FUTSA in an Icelandic forum, and enforcement of the Icelandic forum-selection clause would "transfer an essentially local dispute into a foreign forum." *Monarch Claims Consultants, Inc. v. Fleming*, 372 So. 3d 758, 762 (Fla. Dist. Ct. App. 2023). It would thus be unreasonable and unjust for Stefánsson to avoid liability under U.S. and Florida law for violations occurring while employed there.

## STANDARD OF REVIEW

"The enforceability of forum-selection clauses is governed by federal law" (*AQuate II LLC v. Myers*, 100 F.4th 1316, 1323 (11th Cir. 2024)) and

"is a question of law . . . review[ed] de novo" (*Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1316 (11th Cir. 2013)). The court applies ordinary contract principles to the construction and application of a forum-selection clause. *See Byers*, 701 F.3d at 1340. A "dismissal for *forum non conveniens* is reviewed for abuse of discretion" and is reversible where "the district court has made a clear error of judgment, or has applied the wrong legal standard." *AQuate II LLC*, 100 F.4th at 1320 (citation omitted).

## ARGUMENT

### I. The Terminated Employment Agreement Does Not Govern This Dispute.

The Icelandic forum-selection clause in the terminated employment agreement does not apply to this dispute for several independent reasons. For starters, the employment agreement and the PIIA are not "integrated" contracts. Even if they were, the fact that the parties *terminated* the employment agreement resolves any question that the PIIA's permissive forum-selection clause applies. And in all events, the plain language of the employment agreement's forum-selection clause makes clear it captures disputes concerning only *that* agreement, leaving the PIIA's forum-selection clause to govern disputes relating to the PIIA. The district court

thus erred by holding that the parties elected an Icelandic forum for the claims asserted in this suit.

### A. The Terminated Employment Agreement and the PIIA Were Not Integrated Contracts.

The PIIA (tailored to apply across NetApp companies) and the employment agreement (tailored to Stefánsson's role with NetApp Iceland) are not integrated agreements, and the district court erred in treating them as a single contract that must operate together for all purposes. Although each related to an aspect of Stefánsson's employment with NetApp, each was designed to serve fundamentally different purposes and govern different aspects of NetApp's relationship with Stefánsson. *See Gardinier*, 831 F.2d at 976 ("parties intended to make two separate contracts" where "the nature and purpose of the agreements [we]re different").

1. Consider first the PIIA. The PIIA is a standard agreement, a variation of which all NetApp employees sign and which follows the employee even if he transfers among NetApp entities. Dkt. 1-2 (Preamble); *id.* §§ B, C.3, H, M, O. For that reason, its terms are not specific to Stefánsson or his rights and obligations as an employee of NetApp Iceland.

Rather, it sets forth the typical employee obligations of loyalty and confidentiality for employment with any NetApp entity. *Id.* §§ B, C.1–C.2, D–H, M.

The employment agreement, on the other hand, was designed specifically for Stefánsson and his position with NetApp Iceland. For that reason, the agreement sets forth his duties as VP of Cloud Services, his access to certain payment incentive programs, and the reimbursable nature of business expenses. Dkt. 36-2 §§ 2, 5–7. Many sections address his entitlement to workers' rights as defined by Icelandic law, including "11 hours of rest between shifts," locally defined public holidays, pension payments, vacation, paid sick leave, parental leave rights, and notice of termination. *Id.* §§ 3.1–.4, 8–11.

The only shared subject matter between the two agreements concerned the confidentiality obligations and non-solicitation provision, with the employment agreement referencing the PIIA for the former and the latter restating the PIIA's non-solicitation prohibitions. Dkt. 36-2 §§ 12–13, 14.3. But that these agreements are complementary does not mean (as the district court effectively held) they must be "integrated" for all purposes. *Harvey as Tr. of Russel A. Schlegel Revocable Living Tr. v.*

*Lifespace Comms., Inc.*, 306 So. 3d 1248, 1251 (Fla. Dist. Ct. App. 2020) (no integration where one contract referenced another but did not express "intention to be bound by" its terms). And several provisions of the PIIA and employment agreement make clear the two documents constitute two separate agreements.

**Separately Defined Terms.** The PIIA defines "this 'Agreement'" as the PIIA, separately referencing "any employment agreement or employment offer." Dkt. 1-2 (Preamble); *id.* § M. The employment agreement similarly defines "the 'Agreement'" as "this Employment Contract," making the PIIA a separate defined term and referring to it as such. Dkt. 36-2 §§ 1.2, 12.1.

**Different Governing Law and Forum-Selection Clauses.** Each contract has a different governing-law and venue-selection clause corresponding to the nature of the relationship being regulated. *See Gardinier*, 831 F.2d at 976. The PIIA floats with the employee wherever he goes, so it accordingly requires application of the law of the venue where a breach occurs and provides permissive venue in the "location" the employee "work[s] as of the date hereof," without foreclosing venue elsewhere. Dkt. 1-2 § O. Conversely, the employment agreement applies

only to Stefánsson's employment with NetApp Iceland, so it selects both Icelandic law and venue. Dkt. 36-2 § 20.7.[5]

If the contracts were integrated and intended to select Iceland law for all purposes, the PIIA's floating mandatory choice-of-law provision and its permissive venue provision would be wholly unnecessary. *See Milstein v. Nicklaus*, 412 So. 3d 802, 806 (Fla. Dist. Ct. App. 2025) (declining to apply a mandatory forum-selection clause from one agreement to "all disputes between the parties" when doing so "would render the other three contemporaneous agreements to be equally meaningless, all of which have differing forum-selection clauses"). That violates this Court's direction that a contract must be read "to give meaning to each and every word it contains, and [to] avoid treating a word as redundant or mere surplusage." *Equity Lifestyle*, 556 F.3d at 1242.

**The PIIA Survives Termination.** Both contracts contemplate that the employment agreement can be terminated independently of the PIIA. The PIIA is structured to continue and remain intact regardless of

[5] That each contract contains its own forum-selection clause distinguishes this case from the district court's reliance on *Lallouz v. D.E.T. Card, L.C.*, 724 So. 2d 157, 158 (Fla. Dist. Ct. App. 1998). Dkt. 142 at 29.

whether an employee transfers employment within NetApp. Dkt. 1-2 (Preamble); Dkt. 36-2 § 12.2.

**No PIIA Preemption Clause.** The parties foresaw that the employment agreement could conflict with some other NetApp documents Stefánsson signed, and it provided an express preemption clause in favor of the employment agreement. The parties agreed that the "terms of this Agreement"—defined as the "Employment Agreement"—"will prevail in the event of any conflict between these terms and any provisions in the NetApp policies, internal rules, guidelines, or regulations." Dkt. 36-2 § 20.4. Notably, the PIIA is absent from the scope of that preemption, despite being independently referenced three clauses up in that same section. That choice reinforces that the employment agreement's terms do not supersede the PIIA. *See SE Prop. Holdings, LLC v. Welch*, 65 F.4th 1335, 1344 (11th Cir. 2023) ("the mention of one thing implies the exclusion of another") (citation omitted); *Alamo Fin., L.P. v. Mazoff*, 112 So. 3d 626, 630 (Fla. Dist. Ct. App. 2013) (same).

Together, these "terms . . . demonstrate that the parties intended to make two separate contracts." *Gardinier*, 831 F.2d at 976.

2. In concluding otherwise, the district court overlooked these textual indicators. It misunderstood which parties the agreements covered. And it mistakenly focused on the timing of the agreements and mistook the employment agreement's references to the PIIA as necessarily meaning the agreements were integrated as a single document. *See* Dkt. 142 at 18–20.

Even though a Greenqloud representative (on behalf of NetApp Iceland) signed each agreement, the PIIA applies to all NetApp entities, whereas the employment agreement applied only to NetApp Iceland. That distinction reinforces that the parties intended the agreement to relate to, but operate independently of, another. *See Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 237 (2d Cir. 2006) (concluding that two agreements were not meant to be read as one contract where the parties to one agreement (Arciniaga, GM, and Bay Chevrolet) were different than the parties to the second agreement (only GM and Bay Chevrolet)).

And it does not matter that the documents were signed on the same day, that the PIIA noted that it operates "together with any employment agreement to set forth the parties' entire agreement and understanding,"

or that the employment agreement called the PIIA "integral" to Stefánsson's employment. The employment agreement signifies the PIIA is important or essential because it serves a distinctly critical function. But that language does not merge two separately executed agreements into a single contract, nor does it justify disregarding provisions contained in the PIIA.

That make sense. "Contracts are often conditioned upon completion of totally separate agreements." *Gardinier*, 831 F.2d at 977–78; *accord Milstein*, 412 So. 3d at 806 (forum-selection clause in one agreement did not apply to disputes arising under three contemporaneous agreements with their own forum-selection clauses). And when every provision of these contracts are considered—like the narrow definition of "Agreement" in each agreement and each agreement's distinct governing-law-and-forum-selection clause—it is clear the district court erred by melding these two separate agreements into one. *See Gardinier*, 831 F.2d at 978 (even when "agreements appear in a single document" that "by itself is insufficient to overcome" other textual indicators "demonstrat[ing] the parties' intent to form two contracts").

Because the PIIA is meant to capture multiple employees operating in multiple countries and to float with those employees should they move between companies, the most reasonable reading of the two agreements, each containing a different applicable forum selection clause, is that the parties intended each to *operate independently while remaining complementary*. Accordingly, any cause of action arising under the PIIA should be governed by the PIIA's forum selection clause. The district court erred by holding otherwise.

### B. The Icelandic Forum-Selection Clause Did Not Survive the Termination of the Employment Agreement.

Even if the employment agreement and PIIA were integrated into a single contract at one point, the district court nevertheless erred in applying the employment agreement's forum-selection clause to a dispute having nothing to do with the employment agreement and brought years after its termination. Dkt. 142 at 30. To conclude that the employment agreement's forum-selection clause survived to apply to post-termination breaches of PIIA obligations and to effectively override that agreement's permissive clause makes little sense in light of the distinct functions of each agreement. Worse still, such an interpretation runs headlong into the contracts' text.

1. In December 2022, before the launch of Red Stapler and any of the conduct at issue in this suit, Stefánsson and NetApp Iceland "terminate[d]" the employment agreement "by mutual consent." Dkt. 36-4.

The employment agreement makes clear that his obligations under the PIIA—which it refers Stefánsson to for his confidentiality obligations—are "perpetual and shall survive." Dkt. 36-2 § 12. And it provides that the non-solicitation and non-competition clauses (which are fully laid out within the agreement itself) survive for a period of "1 year" after termination of the employment agreement, meaning that those provisions expired well before the facts at issue here. *Id.* §§ 13.1, 14.1. No other portion of the employment agreement—including the forum-selection clause in Section 20.7—contains a survival clause.

2. It is a basic tenet of contract construction that a "contract should be interpreted to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 742 (11th Cir. 2024) (citation omitted). Like their federal counterparts, Florida courts also assume that "parties to a contract

choose their words on purpose," meaning courts "respect those choices." *Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771, 777 (Fla. 2023).

Drawing on these same legal premises, courts throughout the country have held that forum-selection clauses terminate when no survival clause provides for their continued effect. *Junction Sols., LLC v. MBS DEV, Inc.*, 2007 WL 114306, at *4–5 (N.D. Ill. Jan. 9, 2007).[6] To conclude otherwise would "render meaningless" survival clauses, which enumerate the parties' choices for effective provisions post termination. *Polyflow*, 2016 WL 6909383, at *7 (citation omitted). So a forum-selection clause may survive contract termination only when a survival clause identifies it. *Cf. DVDPlay, Inc. v. DVD 123 LLC*, 930 So. 2d 816, 819 (Fla.

[6] *See also*, *e.g.*, *TSI USA, LLC v. Uber Techs., Inc.*, 2017 WL 106835, at *5–9 (N.D. Tex. Jan. 11, 2017) ("The Survival Clause's omission of the Forum-Selection Clause helps clarify that the Forum-Selection Clause is only meant to apply during the life of the Contract."), *aff'd*, 2017 WL 3209399 (N.D. Tex. June 19, 2017); *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*, 2019 WL 2017541, at *6 (E.D. Va. May 7, 2019) (explaining that "common contract interpretation supports the Court's finding" that the forum-selection clause did not survive termination), *aff'd*, 28 F.4th 1247 (Fed. Cir. 2022); *Polyflow, LLC v. Specialty RTP, LLC*, 2016 WL 6909383, at *7 (S.D. Tex. May 17, 2016) ("[T]he original employment contract has a survival clause that specifies that '[certain provisions] shall survive any termination of the employment relationship or of this Agreement.' None of those enumerated provisions recites, or makes reference to, the forum-selection clause.").

Dist. Ct. App. 2006); *Engle Homes, Inc. v. Jones*, 870 So. 2d 908, 910 (Fla. Dist. Ct. App. 2004) (concluding an arbitration clause survived when it contained a survival clause).

Here, neither of the employment agreement's survival clauses references its forum-selection clause. Nor does the forum-selection clause itself contain survival language. So "[t]he most common-sense and natural reading" of these provisions is that the parties intended only the PIIA's floating forum-selection clause to survive once the employment agreement terminated. *Travelers Indem. Co. of Conn. v. Richard Mckenzie & Sons, Inc.*, 10 F.4th 1255, 1264 (11th Cir. 2021).

3. At most, the employment agreement's forum-selection clause survived *only* as to disputes concerning *that agreement*. Some courts have held that forum-selection clauses may apply post-termination if "applicable to the disputed" obligations contained within that terminated agreement. *U.S. Smoke & Fire Curtain, LLC v. Bradley Lomas Electrolok, Ltd.*, 612 F. App'x 671, 673 (4th Cir. 2015). But the employment agreement is emphatically not "applicable" to this dispute.

Here, of the surviving clauses, one—related to non-solicitation and non-competition—expired one year after the termination of the contract,

meaning it is irrelevant here. Dkt. 36-2 § 14.2 (referencing *id.* §§ 13.1, 14.1). And the other only provides for the survival of the PIIA, under which NetApp, Inc. brought two of its claims. *Id.* § 12.2.

This dispute can thus be wholly resolved without any regard to the employment agreement. NetApp, Inc. does not assert a breach of the employment agreement or rely on that contract in any way. So reading the forum-selection clause to have terminated only as to post-termination obligations—of which there are none—supplies yet another way to give meaning to the PIIA's forum-selection clause, which the district court's reading renders "mere surplusage" under all events. *See Equity Lifestyle*, 556 F.3d at 1242.

Neither of the district court's cited cases requires a different conclusion. One was an unpublished decision of this Court that suggested in passing that a choice-of-law provision would survive termination to avoid "uncertainty" over which law applied. *Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 857–58 (11th Cir. 2016). That dictum is not implicated here: the parties agreed to a *separate choice-of-law and forum-selection clause* in the PIIA. Further, the contract at issue was undisputedly "in force" when the claims arose in *Silverpop*, unlike

here. *Id.* at 857. And in the other case on which the district court relied, a state court addressed a single forum-selection clause, not whether a terminated agreement's narrow forum-selection clause trumped a surviving agreement's forum-selection clause. *Fla. PACE Funding Agency v. Pinellas County*, 385 So. 3d 631, 638–39 (Fla. Dist. Ct. App. 2024).

So even assuming the agreements were integrated into a single contract, the termination of the employment agreement left only one forum-selection clause in play: the PIIA's permissive one. The district court again erred by holding otherwise.

### C. The Terminated Employment Agreement's Icelandic Forum-Selection Clause Does Not Apply to This Dispute.

Even if the agreements were integrated and the employment agreement's Icelandic forum-selection clause continues to bind the parties, that forum-selection clause still applies only to disputes concerning the employment agreement because that is how the parties defined the term "Agreement." By its own terms, the employment agreement's forum-selection clause captures only claims concerning *that* agreement. NetApp, Inc., however, does not bring any claim under the employment agreement

or otherwise mention its existence in its complaint or request for temporary injunction (*see generally* Dkt. 1; Dkt. 3), so the Icelandic employment agreement is entirely irrelevant. *Milstein*, 412 So. 3d at 807 (a forum-selection clause does not apply simply because "the dispute would not have arisen but for the existence of the contract and the consequent relationship between the parties") (citation omitted).

### 1. None of NetApp, Inc.'s Claims Fall Within the Scope of the Employment Agreement.

This Court looks to the plain language of the forum-selection clause to determine whether each claim falls within its scope. *See Byers*, 701 F.3d at 1340. Unlike the PIIA's forum-selection clause, the language of the employment agreement's forum-selection clause is narrow: "*The construction, performance, interpretation and validity of this Agreement* will be governed by and construed in accordance with the laws of Iceland and will be subject to the exclusive jurisdiction of the courts of Iceland." Dkt. 36-2 § 20.7 (emphasis added). Elsewhere, the employment agreement defines the term "Agreement" as "this Employment Contract," meaning the employment agreement. *Id.* § 1.2. Other provisions separate out the PIIA from the definition of "Agreement," defining the term "PIIA" (*id.*

§ 12.1) and stating that "this Agreement, including the PIIA constitutes the entire contract between the Parties" (*id.* § 20.1).

Integration cannot erase these defined terms. So even if the PIIA and the employment agreement constitute a single contract, by separately defining "Agreement" and the "PIIA," the employment agreement's drafters purposefully distinguished between those documents for certain purposes.

The upshot is that when the employment agreement only uses the term "Agreement," it means *only* the portion of that integrated contract contained wholly within the employment agreement. When the employment agreement means both "the Agreement" and the PIIA, it says both. *See Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*, 2022 WL 6635136, at *5 (11th Cir. Oct. 11, 2022) ("[W]here parties use different language in different provisions of a contract, courts presume that those provisions have different meanings."); *Fla. Inv. Grp. 100, LLC v. Lafont*, 271 So. 3d 1, 5 (Fla. Dist. Ct. App. 2019) (courts should "strive to interpret a contract based on the definitions contained within the contract"). Thus, only claims that turn on the "construction, performance,

interpretation and validity" of the employment agreement are subject to mandatory Icelandic jurisdiction.

None of NetApp, Inc.'s claims depend on the construction, performance, interpretation, or validity of the employment agreement. Counts I–II seek injunctive relief and damages for "Stefánsson's multiple breaches of his *PIIA*." Dkt. 1 ¶¶ 44–63 (emphasis added). These counts neither refer to nor require any review of Stefánsson's prior employment agreement with NetApp Iceland; they depend solely on whether actions he took while employed by NetApp, Inc. in Florida violated the PIIA.

Counts III–VI seek injunctive relief and damages for Stefánsson's misappropriation of NetApp's trade secrets in violation of the federal DTSA and Florida's UTSA. Dkt. 1 ¶¶ 64–113. Once again, neither set of claims depends on an interpretation of the employment agreement.

Both the DTSA and FUTSA impose liability where a defendant has misappropriated a trade secret. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1310–11 & n.13 (11th Cir. 2020). One way a defendant can be held to have misappropriated a trade secret under both federal and state law is through the unauthorized disclosure or use of a trade secret

"[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Fla. Stat. Ann. § 688.002(2)(b)(2); *see* 18 U.S.C. § 1839(5)(B)(ii)(II) (similar). Here, there is no dispute that Stefánsson acquired trade secrets under the PIIA, which imposed an obligation of secrecy; the dispute is whether he disclosed or misused those trade secrets that he accessed and downloaded when employed by NetApp, Inc. in Florida. *See* Dkt. 1 ¶¶ 69–70, 80–81, 95–96, 105–06. So these claims too are entirely independent of the employment agreement.

### 2. The DTSA and FUTSA Claims Fall Outside the Scope of Both Agreements.

Even if the defunct Icelandic forum-selection clause could be rewritten to capture claims involving the "construction, performance, interpretation and validity" of the PIIA, NetApp, Inc.'s statutory misappropriation claims would still fall outside the scope of that clause. An employee is not permitted to steal his employer's trade secrets and use them elsewhere. *See Werner Enters., Inc. v. Mendez*, 362 So. 3d 278, 282 (Fla. Dist. Ct. App. 2023) ("employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment"). Stefánsson downloaded

proprietary and highly sensitive NetApp materials to his personal iCloud account and is alleged to have used and disclosed that proprietary and sensitive information at and to his new company. *See supra* Background Part IV; Dkt. 126 at 70:17–19, 71:5–10, 148:5–20.

NetApp, Inc.'s statutory misappropriation claims can turn on that theft, breach of duty of loyalty, misuse, and disclosure. *See* Fla. Stat. Ann. § 688.002(1)–(2); 18 U.S.C. § 1839(5)–(6); *cf. Lee v. Cercoa, Inc.*, 433 So. 2d 1, 2 (Fla. Dist. Ct. App. 1983) ("[A former] employee is under a duty, even in the absence of an express contractual provision, not to disclose [trade-secret] skills, techniques or processes [acquired in previous employment] in his new employment for his own or another's benefit to the detriment of his previous employer.").[7] The DTSA and FUTSA claims thus fall outside the scope of the terminated employment agreement's

[7] *Accord Hightower Holding, LLC v. Kedir*, 2024 WL 3398361, at *11 (N.D. Ill. July 11, 2024) ("While the confidentiality provision in her employment contract may be unenforceable, Hightower also alleges that Kedir had a duty of loyalty to carry out her duties in good faith and not act to the detriment of her employer. When Kedir emailed this document to herself and then shared it with Steward, she likely breached this duty. Such a breach could constitute acquisition by 'improper means.'") (citation omitted).

forum-selection clause in all events.[8]

### 3. The District Court Disregarded Defined Terms.

The district court disagreed primarily by disregarding the agreements' defined terms and thus rewriting the Icelandic forum-selection clause. Each time the district court quoted the language of the employment agreement or the PIIA, it decapitalized the word "Agreement," eviscerating the significance of these definitions and thereby suggesting that the defined term "Agreement" actually meant the (purportedly) integrated "agreement" as a whole. *See* Dkt. 142 at 3, 4, 19, 25, 26. But a court "may not rewrite" contractual language. *Fla. Recycling Servs., Inc. v. Greater Orlando Auto Auction, Inc.*, 898 So. 2d 129, 131 (Fla. Dist. Ct. App. 2005). When read properly, the parties' agreed-to language confined the reach of the Icelandic forum-selection clause to the "Agreement" in which it is contained: the employment agreement.

---

[8] That is what sets this case apart from the single case the district court found using similar language, *Gold Crown Resort Mktg. Inc. v. Phillpotts*, 272 So. 3d 789 (Fla. Dist. Ct. App. 2019). There, plaintiffs' statutory and tort claims *required* the court to determine whether their employer had "denied [them] the benefits of their agreements." *Id.* at 793 n.7. In contrast, NetApp, Inc.'s trade-secret claims do not *require* that Stefánsson breached either the employment agreement or the PIIA. Thus, the district court was wrong to conclude that these claims necessarily implicated the "performance" of either agreement. Dkt. 142 at 33–34.

The parties' express, deliberate, and specific application of the two forum-selection clauses to different circumstances squarely distinguishes this case from those the district court cited that involved no such distinctions and therefore held mandatory forum-selection clauses applied over permissive ones. Dkt. 142 at 23–24. In those cases, the mandatory and permissive clauses were irreconcilable. *E.g.*, *Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 762 (7th Cir. 2006).

Here, the clear but glossed-over definitions avoid any conflict and give effect to both provisions: The Icelandic forum-selection clause applies to claims related to the construction or performance of the employment agreement, and the PIIA's permissive clause applies to claims arising out of the PIIA. *See Inlet Beach Cap. Invs., LLC v. F.D.I.C.*, 778 F.3d 904, 907 n.6 (11th Cir. 2014) ("[I]t is the duty of the court wherever possible to construe apparently conflicting provisions of a contract so that the provisions do not conflict.") (citation omitted); *Equity Lifestyle*, 556 F.3d at 1242 (courts should avoid rendering a provision surplusage or ineffective). At minimum, the latter applied once the former terminated; to hold otherwise would mean the PIIA's provision would *never* have any effect.

Applying the PIIA's permissive forum-selection clause is consistent with the basic principle of contract law that the specific prevails over the general. *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1318 (11th Cir. 2019) (applying Florida law). Between the employment agreement and the PIIA, the PIIA supplies the specifics of the confidentiality obligations that Stefánsson breached when he absconded with NetApp's trade secrets and confidential information. *See* Dkt. 36-2 § 12 (referring to the PIIA for these obligations). So it makes sense for the PIIA's associated forum-selection clause to apply to those obligations, too.

Decisions in the arbitration context are instructive. In *Kel Homes, LLC v. Burris*, for example, the court held a remedies clause that "deal[t] specifically with actions upon default by either party" applied to the exclusion of an arbitration clause dealing "more generally with any dispute arising out of the contract." 933 So. 2d 699, 703–04 (Fla. Dist. Ct. App. 2006) (applying principle that courts should "strive to interpret" contracts to give meaning to all provisions); *see also Ibis Lakes Homeowners Ass'n, Inc. v. Ibis Isle Homeowners Ass'n, Inc.*, 102 So. 3d 722, 729–30 (Fla. Dist. Ct. App. 2012) (similar).

In short, whatever their intent on integration, the parties wrote the employment agreement's forum-selection clause to apply *only* to the "Agreement" in which that clause is contained and only to disputes over that "Agreement['s]" "construction, performance, interpretation or validity." Dkt. 36-2 § 20.7. NetApp, Inc.'s claims under the PIIA, the DTSA, and FUTSA fall outside that scope. Accordingly, applying the PIIA's forum-selection clause here ensures it has effect and causes no conflict with the employment agreement. The district court thus erred in concluding that the employment agreement's clause governed any claim at issue in this case.

## II. Dismissal for *Forum Non Conveniens* Was Unwarranted.

The district court's erroneous conclusion that the employment agreement's mandatory forum-selection clause applied infected its analysis of whether to dismiss for *forum non conveniens*. Instead of evaluating whether Stefánsson cleared the high bar for surmounting NetApp, Inc.'s chosen forum, it considered whether NetApp, Inc. had demonstrated the employment agreement's mandatory selection of Icelandic law should be set aside as against public policy. Once the employment agreement is set aside as irrelevant, however, it is clear that Stefánsson

did not carry his burden to obtain dismissal on the basis of *forum non conveniens*.[9] And even if the employment agreement's mandatory selection of Iceland applied, the district court, at minimum, erred by not setting it aside with regard to the DTSA and FUTSA claims.

### A. Stefánsson Did Not (and Cannot) Show Extreme Circumstances Overcoming NetApp, Inc.'s Choice of Venue.

Once the employment agreement is set aside, the only forum-selection clause left is the permissive forum-selection clause in the PIIA. Dkt. 1-2 § O. "A permissive clause merely consents to jurisdiction in the designated forum and does not foreclose litigation in an alternative forum." *Cardoso*, 596 F. App'x at 885–86. So whether that clause points to Iceland or Florida is irrelevant for the purpose of determining whether dismissal for *forum non conveniens* is proper, because this Court "refuse[s] to dismiss a suit" simply because a permissive forum-selection clause exists. *Snapper, Inc. v. Redan*, 171 F.3d 1249, 1262 n.24 (11th Cir.

[9] As explained above, the DTSA and FUTSA claims can be proven without depending on either of the employment agreement or the PIIA. *See* Argument Section I.C.2. So the district court's failure to analyze whether Stefánsson carried his burden to dismiss those claims under the doctrine of *forum non conveniens* was doubly wrong.

1999).[10] What matters is whether venue is proper in the chosen forum and whether the defendant can overcome that choice. It is, and Stefánsson cannot.

As an initial matter, there is no question that venue is proper in Florida. After all, Stefánsson lived and worked in Florida for NetApp, Inc. when he breached the PIIA and violated federal and state trade secrets laws. *See* 28 U.S.C. § 1391(b)(2) (venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").

The only question is whether Stefánsson—who carries "the burden of persuasion as to all elements of [his] *forum non conveniens* motion"—demonstrated the kind of "unusually extreme circumstances" and "material injustice" that this Court requires to carry his "heavy burden [of] opposing the [domestic NetApp, Inc.'s] chosen forum." *Otto Candies*, 963

---

[10] Before the district court, the parties disputed whether the PIIA's forum-selection clause was permissive as to Iceland (as the location of the PIIA's execution) or Florida (as the location Stefánsson worked at the time of the breach). *See* Dkt. 142 at 24–27. The Court need not address this dispute, because Stefánsson cannot carry his burden to overcome NetApp's choice of forum even if the PIIA reflects the parties' "consent[] to [Icelandic] jurisdiction." *Cardoso*, 596 F. App'x at 886.

F.3d at 1339 (quoting *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004)). In conducting this analysis, a court "[can]not dismiss an action for *forum non conveniens*" unless (1) there is an adequate alternative forum available, (2) the balance of the relevant public and private interests weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice. *Id.* at 1338.

1. The parties' private interests weigh against dismissal. NetApp, Inc. is a U.S. corporation, so this Court "begins with the presumption that a domestic plaintiff has chosen a sufficiently convenient forum," such that Stefánsson must "prove vexation and oppressiveness that are out of all proportion" to tip the scales in his favor. *Otto Candies*, 963 F.3d at 1338–39 (citation omitted). In other words, Stefánsson "bears a heavy burden in opposing" NetApp's chosen forum, and "must offer 'positive evidence of unusually extreme circumstances.'" *Id.* at 1339 (citations omitted).

He has not and cannot do so. He lived in Florida for three years, traveled between Florida and Iceland, and was personally served twice

in Florida when there voluntarily. Dkt. 1 ¶ 16; Dkt. 55 at 4; Dkt. 58; Dkt. 142 at 10 (citing Dkts. 11, 14). Stefánsson offered *no evidence* to the district court that litigation in Florida would be "oppressive[ ]" or "unusually extreme." *See Otto Candies*, 963 F.3d at 1338–39 (citations omitted). Instead, he took advantage of U.S. law to work in this country; he cannot now say it would be inconvenient to withstand suit for his misconduct while here. *Accord* Dkt. 58 at 2 (holding "Stefánsson ha[d] not shown good cause to attend the evidentiary hearing via video conference" rather than in person in Florida).[11]

2. The public interests at stake also weigh against dismissal. Public interests include a sovereign's interest in deciding the dispute, the burdens of trial, the burden of a jury being imposed upon a community with "no relation to the litigation," and whether foreign law applies. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947). Because NetApp, Inc. is a U.S. company, "[t]here is a strong federal interest in making sure that" it "generally get[s] to choose an American forum" for its federal and

[11] Because the district court viewed the *forum non conveniens* analysis through the (erroneous) lens that the employment agreement's mandatory forum-selection clause applied, it did not consider the parties' private interests at all. Dkt. 142 at 38–39.

state claims, "rather than having [its] case relegated to a foreign jurisdiction." *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1311 (11th Cir. 2002). NetApp, Inc.'s claims under the DTSA and FUTSA particularly warrant an American forum with a judge and jury that understand American law.

3. Even though NetApp, Inc. could bring its PIIA and some form of its trade-secret claims in Iceland, doing so would cause it undue prejudice. Icelandic procedural law does not provide for a "general system of discovery," for third-party discovery, for "a declaratory ruling on parties' rights and obligations . . . within a short timeframe," or for preliminary injunctions that "entail a declaration of the applicant's rights" (Dkt. 66-3 ¶¶ 18–26), all of which are crucial procedural mechanisms and remedies in a fast-moving, exigent contractual and statutory misappropriation case.

Further, Stefánsson breached the PIIA and violated state and federal law while employed by NetApp, Inc. in Florida. So the PIIA's mandatory choice-of-law provision *demands* that federal and Florida law apply to the PIIA claim (Dkt. 1-2 § O) and (of course) U.S. law applies to the U.S. claims. NetApp, Inc.'s interests are thus better served by having a

domestic court familiar with federal and Florida law analyze its dispute. *Cf. SME Racks*, 382 F.3d at 1104 ("[I]t is clear that a sovereign has a very strong interest when its citizens are allegedly victims and the injury occurs on home soil."); *accord* Defend Trade Secrets Act of 2016, Pub. L. 114-153, § 5, 130 Stat. 376, 383–84 (2016). Moreover, with the locus of events being in Florida, NetApp, Inc.'s witnesses and digital records are all here. *See Gulf Oil*, 330 U.S. at 508 (considering parties' access to proof and witnesses and ability to compel testimony).

With the employment agreement set aside, venue in Florida was proper and permissible, and Stefánsson cannot overcome that choice for any of NetApp, Inc.'s claims under the PIIA, federal law, or Florida law. Because the district court made a clear error in judgment in applying that defunct agreement and engaging in the wrong *forum non conveniens* analysis, it abused its discretion in dismissing this case under the doctrine of *forum non conveniens*.

### B. It Would Be Unreasonable and Unjust to Apply the Employment Agreement's Mandatory Forum-Selection Clause as to the DTSA and FUTSA Claims.

Even if the mandatory Icelandic forum-selection clause applied, it does not apply to the DTSA and FUTSA claims for the reasons set forth

above. *See* Argument Section I.C.2. And even if it did apply, it should be set aside as to these claims in any event.

It is not clear NetApp, Inc. could even bring its DTSA and FUTSA claims in Iceland. And even the trade-secret claim it could assert under Iceland law would not provide NetApp, Inc. "effective relief for misappropriation affecting U.S. operations;" instead, NetApp, Inc. "may require U.S. statutory and equitable tools (e.g., DTSA remedies and United States' courts' discovery tools)." Dkt. 66-3 at ¶¶ 18, 20 ("[T]he two legal systems [U.S. and Iceland] vastly differ when it comes to discovery and provisional relief mechanisms."). Thus, the import of the district court's analysis would be that NetApp, Inc. cannot obtain the same relief through any other trade secret claim against Stefánsson in Iceland. *Id.* at ¶¶ 18–26; *AQuate II LLC*, 100 F.4th at 1323 (considering whether "the chosen law would deprive the plaintiff of a remedy") (citation omitted).

Moreover, enforcement of the Icelandic forum-selection clause would "transfer an essentially local dispute into a foreign forum." *Monarch*, 372 So. 3d at 762 (citation omitted). Congress, for example, passed the DTSA to protect U.S. companies and U.S. innovation from exfiltration by foreign nationals, with clear extraterritorial reach. *See Motorola*

*Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 483 (7th Cir. 2024) ("[I]t is clear that Congress was concerned with actions taking place outside of the United States in relation to the misappropriation of U.S. trade secrets when it passed the DTSA.") (citation omitted); *accord* DTSA § 5, 130 Stat. at 383–84. U.S. law protects the trade secrets of a U.S. company.

It would therefore be "unfair, unjust, or unreasonable" to allow Stefánsson to benefit from U.S. law as a U.S. employee, only to effectively avoid the application of U.S. law when he violates it while working here. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972).

* * *

NetApp, Inc. and Stefánsson executed two agreements with complementary but separate designs. In elevating the terminated employment agreement above the PIIA, the district court ignored that design, rendered the PIIA's forum-selection clause mere surplusage, and expanded the scope of the employment agreement in ways the parties did not intend. Those errors caused the district court to "deviate from the normal rule that an American plaintiff suing in the United States is presumed to have chosen the most convenient forum." *Otto Candies*, 963

F.3d at 1346. These errors should be corrected and NetApp, Inc.'s suit reinstated in its chosen venue: the Middle District of Florida.

## CONCLUSION

The Court should reverse the district court's order of dismissal and remand for further proceedings.

Dated: March 20, 2026

Respectfully submitted,

*/s/ Blaine H. Evanson*

Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Suite 1200
Irvine, CA 92612
(949) 451-3800
*bevanson@gibsondunn.com*

Katherine K. Vidal
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
(202) 282-5000

Elizabeth A. Kiernan
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
(214) 698-3100

Aly Cox
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500

*Counsel for Appellant NetApp, Inc.*

## CERTIFICATE OF COMPLIANCE

**1. Type Volume**

__X__ This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 11,194 words.

**2. Typeface and Type Style**

__X__ This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point, New Century Schoolbook font.

Dated: March 20, 2026

Respectfully submitted,

*/s/ Blaine H. Evanson*
Blaine H. Evanson

*Counsel for Appellant*
*NetApp, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of March 2026, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

Dated: March 20, 2026

Respectfully submitted,

*/s/ Blaine H. Evanson*
Blaine H. Evanson

*Counsel for Appellant*
*NetApp, Inc.*