No. 26-10482

# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

NETAPP, INC.,

*Appellant*,

v.

JÓN THORGRÍMUR STEFÁNSSON,

*Appellee.*

On Appeal from the
United States District Court for the Middle District of Florida,
No. 6:25-cv-02130-JSS, Hon. Julie S. Sneed

# APPELLEE'S RESPONSE BRIEF


Ian M. Ross
iross@sidley.com
SIDLEY AUSTIN LLP
830 Brickell Plaza
Miami, Florida 33131
Telephone: (305) 391-5100

Nathaniel C. Love
Jennifer M. Wheeler
Abigail Bachrach
nlove@sidley.com
jwheeler@sidley.com
abachrach@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000

*Counsel for Appellee Jón Thorgrímur Stefánsson*

## STATEMENT REGARDING ORAL ARGUMENT

This straightforward appeal concerns application of a mandatory forum selection clause under the doctrine of *forum non conveniens*, with the unremarkable result that any claims against Appellee and Icelandic citizen Jón Stefánsson brought by his former employer must proceed in Iceland pursuant to the parties' agreement. Stefánsson would be glad to conduct oral argument to the extent helpful to the Court in resolving the appeal.

## TABLE OF CONTENTS


INTRODUCTION ........ 1

STATEMENT OF THE ISSUE ........ 3

STATEMENT OF THE CASE ........ 3

I. Background ........ 3

II. Procedural History and Disposition in the District Court ........ 8

III. Statement of Facts ........ 9

A. The Greenqloud Acquisition and Stefánsson's Role at NetApp ........ 9

B. Stefánsson and NetApp Enter Into an Integrated Agreement with a Forum Selection Clause ........ 10

C. Stefánsson's Departure from NetApp ........ 15

D. NetApp's Lawsuit and Its Dismissal ........ 16

SUMMARY OF THE ARGUMENT ........ 18

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 23

I. The Parties' Contemporaneously-Executed, Integrated EA and PIIA Must Be Construed as One Contract ........ 23

A. The District Court Correctly Interpreted the Plain, Unambiguous Language Integrating the EA and PIIA ........ 24

1. The EA and PIIA are Expressly Integrated ........ 24

2. The EA and PIIA Were Executed Contemporaneously Regarding the Same Transaction ........ 27

3. NetApp Relies on Inapposite Authority ........ 29

4. NetApp's Remaining Arguments Mischaracterize the EA and PIIA ........ 32

B. The Employment Agreement's Mandatory Forum Selection Clause Controls ........ 38

C. The Iceland Forum Selection Clause Survives Termination of the Employment Agreement ........ 43

II. The Mandatory Forum Selection Clause Applies to This Dispute ........ 47

A. The Forum Selection Clause Applies to Claims Arising from Stefánsson's Performance of the Integrated Agreement ........ 48

B. The Forum Selection Clause Applies to NetApp's Breach of Contract Claims ........ 49

C. The Forum Selection Clause Applies to NetApp's Statutory Claims ........ 50

III. The District Court Properly Dismissed the Case Under the Doctrine of *Forum Non Conveniens* ........ 54

A. Iceland is an Adequate and Available Forum ........ 55

B. The Balancing of Factors Confirms That Iceland is the Proper Forum ........ 59

C. NetApp Will Not Face Undue Burden Or Prejudice in an Icelandic Forum ........ 63

CONCLUSION ........ 64

## TABLE OF CITATIONS

**Cases** **Page(s)**

*Access Now, Inc. v. Southwest Airlines Co.*,
385 F.3d 1324 (11th Cir. 2004) .................................................... 35, 58

*Aldana v. Del Monte Fresh Produce N.A., Inc.*,
578 F.3d 1283 (11th Cir. 2009) .................................................... 22, 23

*Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*,
788 F.3d 1329 (11th Cir. 2015) ........................................................... 27

*Arciniaga v. Gen. Motors Corp.*,
460 F.3d 231 (2d Cir. 2006) ................................................................ 37

*Atl. Marine Constr. Co. v. United States Dist. Ct. for W. Dist. of Tex.*,
571 U.S. 49 (2013) ........................................................... 21, 54, 55, 60

*Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd*,
722 F. App'x 870 (11th Cir. 2018) ..................................... 48, 55, 57, 60

*Baker v. Econ. Rsch. Servs., Inc.*,
242 So. 3d 450 (Fla. Dist. Ct. App. 2018) ............................................ 51

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*,
2019 WL 2017541 (E.D. Va. May 7, 2019) ........................................... 46

*Clayton v. Howard Johnson Franchise Sys., Inc.*,
954 F.2d 645 (11th Cir. 1992) ............................................................. 25

*Don't Look Media LLC v. Fly Victor Ltd.*,
999 F.3d 1284 (11th Cir. 2021) ........................................................... 58

*Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*,
556 F.3d 1232 (11th Cir. 2009) ........................................................... 42

*Esfeld v. Costa Crociere, S.P.A.*,
289 F.3d 1300 (11th Cir. 2002)....................62

*Fla. PACE Funding Agency v. Pinellas Cnty.*,
385 So. 3d 631 (Fla. Dist. Ct. App. 2024)....................35, 44

*Florida Polk Cnty. v. Prison Health Servs., Inc.*,
170 F.3d 1081 (11th Cir. 1999)....................39

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*,
377 F.3d 1164 (11th Cir. 2004)....................33

*Frida Kahlo Corp. v. Pinedo*,
2021 WL 4147876 (S.D. Fla. Sept. 13, 2021)....................48

*In re Gardinier, Inc.*,
831 F.2d 974 (11th Cir. 1987)....................29, 30

*Gold Crown Resort Mktg. Inc. v. Phillpotts*,
272 So. 3d 789 (Fla. Dist. Ct. App. 2019)....................53, 54

*Harvey v. Lifespace Comms., Inc.*,
306 So. 3d 1248 (Fla. Dist. Ct. App. 2020)....................31

*J.C. Renfroe & Sons, Inc. v. Renfroe Japan Co.*,
515 F. Supp. 2d 1258 (M.D. Fla. 2007)....................63

*Jiangsu Hongyuan Pharm. Co. v. DI Glob. Logistics Inc.*,
159 F. Supp. 3d 1316 (S.D. Fla. 2016)....................60

*Krenkel v. Kerzner Int'l Hotels Ltd.*,
579 F.3d 1279 (11th Cir. 2009)....................39

*Lipcon v. Underwriters at Lloyd's, London*,
148 F.3d 1285 (11th Cir. 1998)....................56

*Mgmt. Computer Controls, Inc. v. Charles Perry Constr., Inc.*,
743 So. 2d 627 (Fla. Dist. Ct. App. 1999)....................39

*Michaluk v. Credorax (USA), Inc.*,
164 So. 3d 719 (Fla. Dist. Ct. App. 2015)....................40

*Milstein v. Nicklaus*,
412 So. 3d 802 (Fla. Dist. Ct. App. 2025) ..................................... 30, 31

*Monarch Claims Consultants, Inc. v. Fleming*,
372 So. 3d 758 (Fla. Dist. Ct. App. 2023) ........................................... 61

*Muzumdar v. Wellness Int'l Network, Ltd.*,
438 F.3d 759 (7th Cir. 2006) ..................................................................... 41

*OMV Assocs. Ltd. P'ship v. TriMont Real Est. Advisors, Inc.*,
484 F. App'x 299 (11th Cir. 2012) ............................................................ 32

*Otto Candies, LLC v. Citigroup, Inc.*,
963 F.3d 1331 (11th Cir. 2020) ................................................................. 59

*Pier 1 Cruise Experts v. Revelex Corp.*,
929 F.3d 1334 (11th Cir. 2019) ................................................................. 25

*Pierre–Louis v. Newvac Corp.*,
584 F.3d 1052 (11th Cir. 2009) ................................................................. 60

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981) ................................................................................... 59

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
119 F.3d 935 (11th Cir. 1997) ................................................................... 58

*Rucker v. Oasis Legal Fin., L.L.C.*,
632 F.3d 1231 (11th Cir. 2011) ................................................................. 23

*S&S Directional Boring & Cable Contrs., Inc. v. Am. Nat'l Bank of Minn.*,
961 So. 2d 1046 (Fla. Dist. Ct. App. 2007) ........................................... 40

*Satz v. McDonnell Douglas Corp.*,
244 F.3d 1279 (11th Cir. 2001) ................................................................. 59

*Sensify (US) Inc. v. Intelligent Telematics N. Am., Inc.*,
2017 WL 1541424 (S.D. Fla. Apr. 28, 2017) ........................................... 45

*Shiloh Christian Ctr. v. Aspen Specialty Ins. Co.*,
65 F.4th 623 (11th Cir. 2023) .................................................................... 28

*Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*,
641 F. App'x 849 (11th Cir. 2016) .................................................44, 45

*Slater v. Energy Servs. Grp. Int'l, Inc.*,
634 F.3d 1326 (11th Cir. 2011)...............................................40, 48, 53

*Stewart Org., Inc. v. Ricoh Corp.*,
810 F.2d 1066 (11th Cir. 1987), *aff'd and remanded*,
487 U.S. 22 (1988).........................................................................51

*Tazoe v. Airbus S.A.S.*,
631 F.3d 1321 (11th Cir. 2011)...................................56, 57, 58, 60, 62

*TSI USA, LLC v. Uber Techs., Inc.*,
2017 WL 106835 (N.D. Tex. Jan. 11, 2017) .......................................46

*Turner v. Costa Crociere S.p.A.*,
9 F.4th 1341 (11th Cir. 2021) .....................................54, 55, 56, 58, 59

*United States v. Cincinnati Ins. Co.*,
2022 WL 1801193 (M.D. Fla. Mar. 25, 2022)...............................45, 46

*Wagner v. Island Romance Holidays, Inc.*,
984 F. Supp. 2d 1310 (S.D. Fla. 2013)................................................61

*Williams IP Holdings, LLC v. Schwarz*,
394 So. 3d 199 (Fla. Dist. Ct. App. 2024)...........................................41

**Statutes**

18 U.S.C. § 1839.............................................................................53

Fla. Stat. § 688.002..........................................................................53

## INTRODUCTION

NetApp, Inc. ("NetApp") filed this suit against its former employee, Jón Stefánsson ("Stefánsson"), in the Middle District of Florida based on speculation that, in departing the company and obtaining new employment, he must have misappropriated NetApp's trade secrets. In preliminary injunction proceedings below, Stefánsson disproved NetApp's groundless, shifting theories of misconduct at every turn. But the district court had no need to reach those claims because it properly dismissed NetApp's suit based on the exclusive forum selection clause in the parties' Employment Agreement. By its express terms, that Employment Agreement included as an "integral" part the Proprietary Information, Inventions, and Non-Solicitation Agreement that forms the basis of NetApp's lawsuit. Any claims NetApp may think it has against Stefánsson belong in the courts of Iceland.

Notwithstanding the dozens of pages NetApp devotes to describing unspecified trade secrets and purported irreparable harm it may face based on its unsubstantiated allegations, this appeal does not concern those issues. Rather, this case turns on a straightforward application of a mandatory forum selection clause. Stefánsson and NetApp executed an

Employment Agreement containing such a clause, NetApp conceded to the trial court that clause has survived any contract termination, and it is bound by those terms. The agreement plainly states that this matter must be resolved in Iceland, where Stefánsson resides, where NetApp has pursued claims against Stefánsson's other colleagues, and where all other aspects of this matter originate.

Based on those unambiguous terms—which NetApp bargained for—the district court properly dismissed this case under the doctrine of *forum non conveniens*. It applied settled principles of contract interpretation to the parties' integrated agreement designating Iceland as the exclusive forum for disputes regarding Stefánsson's employment. Because there is no ambiguity in the agreement, NetApp's resort to extrinsic evidence (including the declarations cited throughout its brief) is inappropriate. And NetApp's new arguments, not raised before the district court, are inconsistent with the plain meaning of the integrated agreement. The district court's straightforward application of well-established law to the parties' agreement should be affirmed.

## STATEMENT OF THE ISSUE

Whether the district court properly applied a mandatory, exclusive forum selection clause in the agreement between the parties, which specifies Iceland as the proper forum, in dismissing on the basis of *forum non conveniens*.

## STATEMENT OF THE CASE

### I. Background

Stefánsson is a citizen of Iceland. Doc. 36-1 ¶ 2. In 2017, NetApp acquired Stefánsson's Icelandic company, Greenqloud ehf. Doc. 1 ¶ 25. In connection with that acquisition, Stefánsson executed an Employment Agreement, Doc. 36-2 ("EA"), with NetApp. Although NetApp now suggests that this Employment Agreement was executed to "comply with local law," Opening Brief of Appellant NetApp ("NetApp Br.") at 2, the Agreement NetApp prepared is worldwide in scope, defining NetApp to include "any and all NetApp entities," and expressly stating that the Agreement "will remain in full force and effect should the Employee be transferred to a different part of NetApp." Doc. 36-2 ¶¶ 1.5–1.6.

The Employment Agreement explained that its effectiveness was "contingent upon the Employee satisfactorily completing, agreeing to, signing and otherwise fulfilling" a series of other NetApp policy

documents provided to Stefánsson, *id.* ¶ 19.2, including NetApp's Proprietary Information, Inventions, and Non-Solicitation Agreement ("PIIA"). Doc. 1-2. The Employment Agreement expressly incorporated the PIIA as its "integral part": "The Employee will sign the PIIA, *which forms an integral part of this Agreement*, together with the signing of this Agreement." Doc. 36-2 ¶ 14.3 (emphasis added). As detailed below, both the Employment Agreement and the PIIA also contain mirroring integration clauses. *Id.* ¶ 20.1 ("This Agreement, including the PIIA, constitutes the entire contract between the Parties"); Doc. 1-2 ¶ M ("This Agreement (together with any employment agreement or employment offer I may be subject to) sets forth the entire agreement"). The EA further included a mandatory forum selection clause providing that disputes concerning performance under the agreement "will be subject to the exclusive jurisdiction of the courts of Iceland." Doc. 36-2 ¶ 20.7.

For the next six years, Stefánsson worked for NetApp in Iceland. Doc. 36-1 ¶¶ 4, 6. Increasingly, though, he was asked to cover both European and U.S. West Coast hours, and eventually found working 16–18 hour days untenable. Doc. 154 at 217:3–9. He told his supervisor he intended to resign, but his supervisor instead suggested that he relocate

to the United States to maintain his employment. *Id.* at 217:12–19. Following his supervisor's suggestion, Stefánsson relocated to the United States in January 2023. Doc. 36-1 ¶ 6. Stefánsson considered this move to Florida to be temporary. His children did not accompany him to Florida, and Stefánsson and his wife always intended to return to Iceland. Doc. 154 at 220:3–10 ("I'm Icelandic. My family is in Iceland. My friends are in Iceland.").

When he moved, the parties signed a shortform relocation agreement explaining that Stefánsson's salary and benefits in Iceland would cease, and confirming that his Employment Agreement would "terminate by mutual consent." Doc. 36-4. As explained below, under Florida or Icelandic law, this relocation agreement terminated the performance-related obligations of the agreement, but its forum selection clause and other structural provisions survived that termination—which NetApp conceded before the district court.

Stefánsson worked countless hours for NetApp from a remote office in Florida for the next two years. But after enduring years away from his life, children, family, and friends, Stefánsson returned to Iceland in May

2025 and resigned from NetApp soon after. Doc. 154 at 220:8–13, 243:22–244:4.

Following his departure, Stefánsson and some longtime Icelandic friends—who had worked with Stefánsson at Greenqloud and NetApp, and who had also departed—talked about forming a new company for this new phase of their careers. *Id.* at 233:21–235:24. They called this brainstorming effort "Red Stapler," and incorporated an entity by that name in Iceland on July 3, 2025.[1] *Id.* at 234:15–17; Doc. 36-1 ¶ 13. A few months later, in September 2025, VAST Data UK Limited ("VAST") acquired Red Stapler in an "acqui-hire." Doc. 1 ¶ 37; Doc. 154 at 260:20–24. Red Stapler had no software, code, product, or other intellectual property, and none was transferred as part of the acquisition. Doc. 36-1 ¶¶ 16–20. Rather, VAST used the acquisition of Red Stapler to hire Stefánsson and his Iceland-based team. Doc. 1 ¶ 37.

[1] NetApp's brief continues to trumpet a false, inflammatory narrative that the name was intended to express "contempt for NetApp," although the undisputed evidence presented to the district court was that it was a name that the Greenqloud employees had used since its "inception," referencing a movie favorite used at Halloween parties and in the office. Doc. 154 at 234:15-24.

NetApp grossly misinterpreted this sequence of events as evidence of trade secret misappropriation. NetApp could not simply accept that some of its longtime employees were unhappy and decided to pursue their careers in a different part of the industry. NetApp brought this action based on a shifting set of unsupported theories amounting to a claim that Stefánsson *must have* misappropriated some unidentified NetApp trade secrets. Doc. 1 ¶¶ 10–11.[2]

Those claims are without basis. From the outset of this case, Stefánsson has consistently maintained—and evidence he submitted in the district court record reflects—that he did not take, use, or access any NetApp proprietary information. NetApp has failed to show otherwise. Notably, when Stefánsson presented his response to NetApp's allegations to the district court after NetApp had initially obtained its temporary restraining order *ex parte*, the district court declined to convert the TRO into a preliminary injunction on the papers, and instead set the matter for hearing. At the preliminary injunction hearing, Stefánsson testified that his work at VAST involves a third-party cloud platform distinct from

[2] Stefánsson did not sign a noncompete agreement with NetApp, and NetApp does not allege that he did. Doc. 154 at 177:24–25.

NetApp's first-party approach, Doc. 154 at 239:7–14; 258:18–259:6—a substantive technical distinction acknowledged by NetApp's witnesses.

Regardless, NetApp's extensive presentation of its groundless theories amounts to nothing. As the district court correctly held, NetApp filed this case in the wrong forum, and any dispute involving NetApp's accusations of misconduct by Stefánsson belongs, if anywhere, in the courts of Iceland.

## II. Procedural History and Disposition in the District Court

On November 6, 2025, NetApp filed this action in the United States District Court for the Middle District of Florida against Stefánsson, alleging causes of action for breach of contract and misappropriation of trade secrets. Doc. 1 ¶¶ 64–89; 90–113. NetApp also sought an immediate temporary restraining order against Stefánsson, Doc. 3, which the district court granted six days later on November 12, Doc. 13, prior to any appearance by counsel for Stefánsson. *See* Doc. 19. The TRO expired on November 19, and NetApp moved to convert it to a preliminary injunction. Doc. 15. The district court did not rule on that motion.

Counsel for Stefánsson appeared on November 21, 2025. Doc. 19. On December 4, 2025, Stefánsson moved to dismiss on the grounds of

*forum non conveniens* and lack of personal jurisdiction. Doc. 36. On the same date, Stefánsson also opposed the motion to convert the TRO into a preliminary injunction. Doc. 37. NetApp filed its response on December 23, Doc. 66, and Stefánsson replied on December 31, Doc. 81.

On January 5, 2026, the district court heard argument on Stefánsson's motion to dismiss via videoconference. Doc. 88. On January 12, 2026, the court conducted a full-day, in-person evidentiary hearing on NetApp's preliminary injunction motion. Doc. 118. The court heard testimony from multiple NetApp witnesses, and Stefánsson also testified and was cross-examined by NetApp's counsel. Doc. 154.

On January 30, 2026, the district court granted the motion to dismiss, finding that the forum selection clause in Stefánsson's employment agreement, which exclusively designated Iceland as the forum, controlled and accordingly dismissed under the doctrine of *forum non conveniens*. Doc. 142.

## III. Statement of Facts

### A. The Greenqloud Acquisition and Stefánsson's Role at NetApp

Stefánsson has worked and lived in Iceland for the majority of his life. Doc. 1 ¶ 25. Over a decade ago, he co-founded Greenqloud ehf., an

Iceland-based cloud services company. *Id.*; Doc. 36-1 ¶ 4. Greenqloud developed a cloud services orchestration and management platform and operated from Reykjavík, Iceland. Doc. 1 ¶ 25. In 2017, NetApp, Inc., a provider of data management and cloud services, acquired Greenqloud, which became NetApp's Iceland entity. *Id.*; Doc. 36-2 ¶¶ 1.4, 2.1. As a result of that acquisition, Stefánsson began working for NetApp in Iceland.

### B. Stefánsson and NetApp Enter Into an Integrated Agreement with a Forum Selection Clause

As part of NetApp's acquisition of his company, Stefánsson concurrently entered into two agreements with NetApp in Iceland—the Employment Agreement and the Proprietary Information, Inventions, and Non-Solicitation Agreement. It is undisputed that both agreements were executed contemporaneously in Iceland. Doc. 142 at 20; *see also* Doc. 105 at 33:10–13 (counsel for NetApp agreeing that the PIIA pointed to Iceland when Stefánsson worked there).

Together, the EA and PIIA governed Stefánsson's employment relationship with NetApp. The EA addresses, among other things, Stefánsson's position, duties, compensation, and intellectual property obligations. Doc. 36-2 ¶¶ 2, 4–10, 18. The EA also makes clear that

Stefánsson could perform work for other NetApp entities while remaining subject to the same governing agreement—his employment is subject to NetApp's broader policies and procedures, and he may perform work for different entities within the "NetApp Group," which is defined to include NetApp and its affiliated entities. *Id.* ¶¶ 1.4–1.5. The EA remains in effect upon Stefánsson's transfer to other NetApp entities. *Id.* ¶¶ 1.6, 20.2.

The PIIA expressly states that it is being executed to "confirm certain terms of [Stefánsson's] employment," and it supplements the EA by expanding on the obligations regarding confidentiality, intellectual property, and post-employment conduct. Doc. 1-2 ¶¶ B–D, G, H. Among other things, it requires confidentiality and non-solicitation obligations for a specified period after employment. *Id.* ¶¶ B, H.[3]

[3] Although NetApp's brief refers to the PIIA as its "standard PIIA" (*see* NetApp Br. 13, 30), that is not accurate. The PIIA Stefánsson signed expressly references the Greenqloud acquisition (*see* Doc. 1-2 at 1), and expressly states that it is "in addition to and shall not supersede any covenants entered into in connection with the Greenqloud acquisition, *even those that appear similar*," such as the covenants in the Employment Agreement. *Id.* (emphasis added). The EA is a "covenant entered into in connection with the Greenqloud acquisition," as NetApp admits. *See* NetApp Br. 35.

**Express Integration.** The EA and the PIIA are expressly integrated and interdependent, and include multiple cross-references to one another. The EA states that the PIIA "forms an integral part of" the EA and requires compliance with its confidentiality provisions. Doc. 36-2 ¶ 14.3. It further provides that "[t]his Agreement, including the PIIA, constitutes the entire contract between the Parties regarding the employment of the Employee," and conditions execution of the EA on also signing the PIIA. *Id.* ¶¶ 20.1, 19.2. That is, "the entire contract" between Stefánsson and NetApp is the EA *and* the PIIA.

The PIIA includes mirrored integration language. First, it operates "together with any employment agreement" and Stefánsson's employment is "contingent" on him entering the PIIA alongside the Employment Agreement. Doc. 1-2 at 1 and ¶ M. Second, as noted above, the PIIA provides that its terms supplement, rather than replace, obligations arising from the acquisition. *Id.* at 1 (terms are "in addition to and shall not supersede any covenants entered into in connection with the Greenqloud acquisition"). Third, the PIIA's integration clause matches the clause in the EA, stating that "the entire agreement" between Stefánsson and NetApp is the EA *and* the PIIA. *Id.* ¶ M.

**Complementary Forum Selection and Choice of Law Clauses.** The EA and PIIA each contain choice of law and forum selection clauses anchoring any dispute in Iceland. The EA provides for Icelandic choice of law and mandatory forum selection in Iceland:

> The construction, performance, interpretation and validity of this Agreement will be governed by and construed in accordance with the laws of Iceland and will be subject to the exclusive jurisdiction of the courts of Iceland.

Doc. 36-2 ¶ 20.7.

The PIIA contains a floating choice of law provision but, contrary to NetApp's argument, does not dictate the forum where disputes are resolved. Instead, the signor simply consents to jurisdiction and venue in the courts of the location in which Stefánsson worked "hereof," which the district court properly interpreted to mean "as of the date of [signing]," and therefore Iceland. Doc. 142 at 25–26. The PIIA states:

> I understand and agree that this Agreement shall be interpreted and enforced in accordance with the laws of the state or country of the location in which I work as of the date of the occurrence of the breach for which enforcement of this Agreement is sought, without giving effect to any conflicts of laws principles that require application of the law of a different state or country. I hereby expressly consent to the personal jurisdiction and venue in the state and federal courts of the country and county of the location in which I work as of the date hereof for any lawsuit filed there against

> me by the Company arising from or related to this Agreement.

Doc. 1-2 ¶ O.

This complementary structure makes sense. As NetApp acknowledges, a PIIA may be signed by a NetApp employee who has not signed an employment agreement. NetApp Br. 13. Although there is no mandatory forum for disputes for those employees, the PIIA provides a floating choice of law and consent-to-jurisdiction clause that fixes a place where NetApp *may* bring suit where the employee cannot oppose jurisdiction and venue. But when the PIIA is part of the Employment Agreement, like here, then NetApp *must* bring suit as provided in the mandatory forum selection clause. And the Employment Agreement makes clear it controls over other documents in such instances: "The terms of this Agreement (including any amendments) will prevail in the event of any conflicts between these terms and any provisions contained in the NetApp policies, internal rules, guidelines, or regulations." Doc. 36-2 ¶ 20.4. In accord, the PIIA states it shall *not* "supersede any covenants" the parties signed when Stefánsson joined NetApp. Doc. 1-2 at 1.

### C. Stefánsson's Departure from NetApp

Following the acquisition, Stefánsson continued working for NetApp in Iceland. Doc. 1 ¶ 26. He served in senior leadership roles based in Iceland, including Vice President of Cloud Services. *Id.* During that time, he did not sign any other agreements.

In January 2023, NetApp proposed that Stefánsson temporarily relocate to Florida. Doc. 36-1 ¶ 6. In connection with that move, the parties agreed to terminate the EA. Doc. 36-4. NetApp did not seek to replace the EA with some other agreement, and Stefánsson signed no further agreements with NetApp—no new employment agreement and no new PIIA. Doc. 36-1 ¶ 6.

Over approximately eight years (including work in Iceland and a short period in Florida), Stefánsson served as a senior leader in NetApp's cloud services business. Doc. 1 ¶ 4. NetApp alleges that, by virtue of his role, Stefánsson had access to confidential and proprietary information. *Id.* According to the Complaint, this included access to broad, non-specific concepts such as NetApp's cloud service delivery systems and relationships with third-party cloud providers. *Id.* The Complaint does

not identify any specific information Stefánsson purportedly accessed and later misused. *See generally* Doc. 1.

Stefánsson sent NetApp his resignation letter on June 12, 2025. Doc. 36-1 ¶ 11. He had already returned to Iceland—to his home, children, and the center of his professional life. *Id.*; Doc. 154 at 204:16–19. He then co-founded a new company called Red Stapler in Iceland with several former NetApp colleagues, who were also based in Iceland. Doc. 36-1 ¶ 11. Red Stapler was incorporated in Iceland on July 3, 2025. *Id.* ¶ 13. Shortly thereafter, VAST, a competitor of NetApp, acquired Red Stapler. Stefánsson assumed an executive role at VAST, remaining in Iceland. Doc. 1 ¶¶ 8, 10.

**D. NetApp's Lawsuit and Its Dismissal**

NetApp seeks to litigate claims in Florida arising from Stefánsson's purported breaches of the PIIA and misuse of information he allegedly obtained while at NetApp. On November 6, 2025, NetApp brought suit against Stefánsson and sought a TRO. Doc. 1; Doc. 3. The allegations rest not on any facts, but on NetApp's speculation that the timing of events since Stefánsson's departure could only be explained by his supposed development of technology or business opportunities for Red Stapler

while still employed at NetApp, which (according to NetApp), he must have accomplished by improperly leveraging unspecified NetApp proprietary information. Doc. 1 ¶¶ 10 n.8, 40. On that basis, NetApp alleges that Stefánsson breached his contractual obligations and misappropriated trade secrets. *Id.* ¶¶ 44–113.

Stefánsson vehemently disputes these allegations (many of which NetApp abandoned mid-briefing) and presented evidence firmly rebutting them in the preliminary injunction proceedings. Doc. 154. He also moved to dismiss based on the parties' exclusive, mandatory forum clause. Doc. 36. In connection with his motion to dismiss, he submitted a declaration stating that he did not take or use any NetApp proprietary information upon leaving the company, that he has not accessed or worked on NetApp intellectual property since his departure, and that he is not aware of any such use by others associated with Red Stapler. Doc. 36-1 ¶¶ 16–19. Red Stapler did not possess or transfer any NetApp technology and VAST's acquisition of Red Stapler was undertaken for hiring purposes (as part of an "acqui-hire" of Stefánsson and others), rather than for the acquisition of any product or intellectual property. *Id.* ¶¶ 20–21.

After the motion to dismiss was fully briefed on December 31, 2025, Doc. 81, the district court heard oral argument on January 5, 2026, Doc. 105. On January 30, 2026, the district court granted Stefánsson's motion to dismiss. *See generally* Doc. 142. The court concluded that the Employment Agreement and the PIIA formed a single integrated agreement and that the EA's forum selection clause governs this dispute. *Id.* at 33–34. The court further determined that the EA's forum selection clause was enforceable and required that the action be litigated in Iceland. *Id.* at 37–38. Accordingly, the district court dismissed on the basis of *forum non conveniens*. *Id.* at 40.

## SUMMARY OF THE ARGUMENT

The district court's decision should be affirmed. NetApp is bound to litigate any claims against Stefánsson under the terms of the mandatory forum selection clause in the integrated agreement it drafted. That integrated agreement expressly specifies Iceland as an exclusive forum. The doctrine of *forum non conveniens* establishes that this matter belongs (if anywhere) in the courts of Iceland.

***First***, the district court correctly held that the EA and PIIA entered between Stefánsson and NetApp governing Stefánsson's employment

must be read together. They were executed at the same time, in the same place, as part of the same transaction, and they expressly integrate and depend on each other. By its plain terms, the PIIA is integrated into and an "integral part" of the EA, and the documents mutually state that they together form the entire agreement governing the relationship between Stefánsson and NetApp.

As the district court found, when the EA and PIIA are read together, the EA's forum selection clause controls. That clause is mandatory by its own language—it provides that the agreement "will be subject to the exclusive jurisdiction of the courts of Iceland." By contrast, the PIIA contains only a permissive consent-to-jurisdiction provision. NetApp's Brief improperly relies on extrinsic evidence such as how it prepares *other* agreements and declarations regarding when *other* employees sign employment agreements, contradicting its own argument that this matter is resolved based on the plain, unambiguous meaning of the terms themselves. NetApp also relies on a series of new arguments never made to the district court, and suggests that the district court's reading would render the PIIA's consent-to-jurisdiction language as mere surplusage, ignoring the fact that the agreements by the parties provided

that the forum selection clause supersedes that language. Regardless, there is no inconsistency between the EA's mandatory venue provision and the PIIA's permissive consent-to-jurisdiction provision. And, in any event, both clauses point to the same venue: Iceland.

NetApp's arguments also ignore the law supporting the district court's conclusion that the EA's forum selection clause survived when the EA was later terminated. Under Florida, Icelandic, and federal common law, forum selection clauses are structural provisions that ordinarily survive termination. NetApp's effort to relitigate this issue is remarkable, given that it does not present a single case reaching a contrary result, and given that NetApp conceded this argument before the district court.

***Second***, the district court correctly concluded that the mandatory forum selection clause applies to this dispute. NetApp's claims arise from the same allegations regarding Stefánsson's performance under the parties' integrated agreement. NetApp specifically pleaded breach of contract claims, alleging breach of the PIIA, an integrated part of the Employment Agreement. NetApp alleges that Stefánsson acquired confidential information through his employment, owed duties

concerning confidentiality and intellectual property, and purportedly breached those duties in connection with his departure. Those allegations necessarily arise from, relate to, and depend upon his performance under the parties' integrated agreement. NetApp cannot avoid the forum selection clause simply by repackaging contract-based allegations as statutory claims, especially where, as here, the statutory claims each cite and expressly rely on Stefánsson's contractual obligations as the basis for the information allegedly obtained and duties allegedly owed. Doc. 1 ¶¶ 69, 80, 95, 105.

***Third***, because a valid and enforceable forum selection clause applies, requiring litigation in Iceland, dismissal under *forum non conveniens* must follow. Because a mandatory forum selection clause "represents the parties' agreement as to the most proper forum," it is given "controlling weight in all but the most exceptional cases." *Atl. Marine Constr. Co. v. United States Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (citation omitted). There are no exceptional circumstances justifying departure from the parties' negotiated forum. Iceland is an available and adequate forum. NetApp did not establish otherwise below, and the arguments it advances for the first time here (concerning

differences in remedies or procedure) are both waived and meritless. NetApp's suggestion that it will be prejudiced by the forum it chose and agreed to (and where it is pursuing other claims against its former employees) is specious: the standard it must satisfy to invalidate its own argument is to show that the forum it chose will provide "no remedy at all," a standard it cannot meet.

Straightforward contractual interpretation—a characterization with which NetApp agrees, *see* App. Doc. 9, NetApp Motion to Expedite at 10—and enforcement thus resolved the case below and resolves this appeal. NetApp's attempt to introduce extrinsic evidence to counter the unambiguous contract is both improper and unavailing. The parties agreed to litigate any disputes arising from Stefánsson's employment in Iceland. The district court correctly enforced that agreement and dismissed this action. Its judgment should be affirmed.

## STANDARD OF REVIEW

A district court's dismissal based on *forum non conveniens* may only be reversed if it constitutes a "clear abuse of discretion." *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1288 (11th Cir. 2009). This standard is "extremely limited and highly deferential" to the district

court's finding. *Id.* (cleaned up). The reviewing court must affirm unless the district court "made a clear error of judgment, or has applied the wrong legal standard." *Id.* Although interpretation of a contract is subject to *de novo* review, *Rucker v. Oasis Legal Fin., L.L.C.*, 632 F.3d 1231, 1235 (11th Cir. 2011), when the district court's decision does not amount to a clear error of judgment or involves application of the wrong legal standard, the reviewing court may not reverse even if, had it been in the district court's position, the reviewing court would have "gone the other way," *Aldana*, 578 F.3d at 1288.

## ARGUMENT

### I. The Parties' Contemporaneously-Executed, Integrated EA and PIIA Must Be Construed as One Contract

The parties concurrently entered into the EA and PIIA as an integrated agreement upon the beginning of Stefánsson's employment with NetApp. The district court correctly held that they should be construed as a single agreement and that the PIIA is integrated into the EA, pursuant to the plain terms of each document. NetApp's contrary arguments—that the EA and PIIA are not integrated, that the clause did not survive termination, and that it does not apply to this dispute—fail on multiple grounds. The EA and PIIA by their terms form a single

integrated agreement; that agreement contains a mandatory forum selection clause governing disputes about Stefánsson's "performance" under the contract; that clause is a structural provision that survives termination as a matter of law; and it applies to all of NetApp's claims, which arise from Stefánsson's performance of his obligations under the integrated agreement.

### A. The District Court Correctly Interpreted the Plain, Unambiguous Language Integrating the EA and PIIA

The PIIA and the EA are meant to be read together: they regard the same employment relationship, they were executed at the same time, and each was made contingent on the other's execution. Doc. 142 at 17. The district court correctly held that the EA and PIIA must be construed together as a single, integrated agreement. *Id.* at 20. That conclusion follows directly from the text (each explicitly incorporating the other, and declaring the PIIA to be an integral "part" of the EA), the circumstances of execution, and settled principles of law.

#### 1. The EA and PIIA are Expressly Integrated

The EA and PIIA expressly state that they form an integrated contract. The EA states that the PIIA is an "integral part" of it and provides that "this agreement, including the PIIA, constitutes the entire

contract[4] between the parties," Doc. 142 at 19 (citing Doc. 36-2 ¶ 20.1), and the PIIA mirrors that integration, stating that it, "together with [the] Employment Agreement . . . sets forth the entire agreement" between NetApp and Stefánsson. Doc. 1-2 ¶ M; *see also* Doc. 142 at 4. Courts find integration between two contracts where two writings "contain numerous cross-references and other evidence that they are functionally intertwined," this "indicat[es] that the parties contemplated that the two documents would be considered together." *Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 649 (11th Cir. 1992); *see also Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1341 (11th Cir. 2019) ("What's more, the two contracts cross-reference one another, further suggesting interdependency."). Icelandic law is equally clear on this point. Doc. 36-9 ¶ 2.3 (Declaration of Icelandic attorney in support of motion to dismiss stating "[i]f two documents are expressly stated to be

[4] NetApp's argument that the definitions or capitalizations of "agreement" in the PIIA and EA mean they should be read separately (*see* NetApp Br. 5, 44, 48–49) is unavailing. The capitalized term "Agreement" in the EA, by the EA's own terms, expressly states that the PIIA "forms an integral part of this [capitalized] Agreement." Doc. 36-2 ¶ 14.3. NetApp suggests that the district court "disregarded" the capitalized term, NetApp. Br 49, but it is NetApp who asks the Court to disregard the express integration of the PIIA into that capitalized term.

part of the same agreement, Icelandic courts would typically interpret them together, especially when one is incorporated by reference into the other.”).[5] This language alone establishes that the parties intended the two documents to be read as one agreement.

Moreover, the EA and PIIA’s other interlocking provisions further reinforce their status as one integrated agreement. The EA requires that Stefánsson “comply with the confidentiality provisions set forth in the [PIIA],” Doc. 36-2 ¶ 12.1, and makes employment “contingent on” executing the PIIA, *id.* ¶ 19.2. The PIIA, in turn, expressly states that it is executed to “confirm” the terms of employment and contemplates that Stefánsson was “subject to” an employment agreement. Doc. 1-2 ¶ M. These provisions confirm that the EA and PIIA are not merely related—they are mutually dependent and integrated as part of a single contractual framework. Indeed, NetApp concedes that the EA and the PIIA are “complementary” in that they both consider aspects of Stefánsson’s employment. NetApp Br. 31.

---

[5] The district court applied federal law, observing that principles of Florida law and federal law are “virtually” the same. Doc. 142 at 15–16. The parties likewise agreed that Florida and Icelandic contractual interpretation principles were the same. Doc. 105 at 12:24–13:5; 31:11–18.

### 2. The EA and PIIA Were Executed Contemporaneously Regarding the Same Transaction

The EA and PIIA were executed contemporaneously regarding the same transaction: Stefánsson's employment with NetApp followed the Greenqloud acquisition. The district court properly found that "Stefánsson's employment agreement and the PIIA must be read together, as they . . . were 'executed by the same parties, at or near the same time,' with respect to 'the same transaction.'" Doc. 142 at 20 (citing *Rios v. Quiala*, 279 So. 3d 1244, 1246 (Fla. Dist. Ct. App. 2019); *see also Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1339 (11th Cir. 2015) ("[A]ll writings that are part of the same transaction are interpreted together.") (quoting Restatement (Second) of Contracts § 202(b)). Icelandic law concurs: "Claims for misappropriation of trade secrets or breach of the PIIA are necessarily claims relating to the 'performance' of the parties' agreements, here, the Employment Agreement and the PIIA." Doc. 36-9 ¶ 2.11.

NetApp mischaracterizes the integrated agreement by claiming that the EA and PIIA are not based on the "same transaction." NetApp Br. 25, 30–32. NetApp is wrong. As the district court found, both the EA

and PIIA were executed "[a]s part of the same acquisition transaction" and govern the same employment relationship between the parties, including overlapping duties relating to intellectual property and non-solicitation. Doc. 142 at 18. NetApp's argument that these documents are used for different purposes in other contexts is improper: first, it was not made to the district court, and second, it relies on extrinsic evidence that cannot alter the plain terms of the parties' agreements.[6] *Shiloh Christian Ctr. v. Aspen Specialty Ins. Co.*, 65 F.4th 623, 627 (11th Cir. 2023) (where contract language is unambiguous, "it governs—end of story" and noting "[i]t is well established under Florida law that parol evidence is inadmissible to vary or contradict the clear and unambiguous language of a contract") (cleaned up)).

[6] For example, NetApp argues that "U.S.-based employees *do not* sign an employment agreement." NetApp Br. 13 (emphasis added), 16 (citing Doc. 66-4). The declaration it filed does not state that as an absolute. Doc. 66-4. What NetApp told the lower court was that written employment agreements were not usual practice for U.S.-based employees, but that appears inaccurate based on public filings. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1002047/000095017025029066/ntap-ex10_1.htm; https://www.sec.gov/Archives/edgar/data/1002047/000156459020029349/ntap-ex1058_211.htm.

### 3. NetApp Relies on Inapposite Authority

NetApp's various arguments attempting to tease apart its integrated agreement ignore the contractual language and rely on inapposite authority. NetApp claims that it "does not matter" that the PIIA states that it operates "together with" the EA or that the EA holds the PIIA as "integral" to NetApp's employment of Stefánsson. NetApp Br. 35–36. NetApp principally relies on *In re Gardinier, Inc.*, 831 F.2d 974 (11th Cir. 1987) (*see* NetApp Br. 36), but that case bears no resemblance to this one. *Gardinier* is a bankruptcy dispute involving whether a trustee was required to assume a seller's broker commission obligation when it assumed a purchase and sale agreement. 831 F.2d at 974–75. Although a single instrument memorialized the property sale and included the brokerage commission obligation, the court held that the brokerage commission obligation was a separate agreement because the parties were different, "the nature and purpose of the agreements are different," the consideration was "separate and distinct," and the obligations were not "interrelated." *Id.* at 976–77. Setting aside the entirely different factual circumstances of that case, none of those elements the Court considered there are present here.

Here, the EA and the PIIA both involve the same parties, arise from the same transaction, and govern the same employment relationship, particularly with respect to intellectual property. *Compare* Doc. 1-2 ¶ C.1 *with* Doc. 36-2 ¶ 18.2. They share the same underlying consideration: Stefánsson's agreement in exchange for employment. Their obligations are interrelated—the EA incorporates the PIIA, and the PIIA supplements obligations arising from the acquisition. And most importantly, unlike in *Gardinier*, there is clear evidence "from the face of the instrument that the parties intended to make only one contract." *Gardinier*, 831 F.2d at 976. As mentioned above, both the EA and PIIA expressly state that they together form the parties' entire agreement.

*Gardinier* also relies on a finding that "the obligations of each party to the instrument are not interrelated." *Id.* The opposite is true here: the EA specifically contemplates duties under the PIIA (*e.g.* ¶ 12.1), and the PIIA confirms that it operates alongside, and does "not supersede any covenants" arising from the acquisition, *i.e.* the EA. Doc. 1-2 ¶ 1. NetApp's reliance on *Milstein v. Nicklaus*, 412 So. 3d 802, 806 (Fla. Dist. Ct. App. 2025) is equally unavailing. *See* NetApp Br. 36. That case concerned multiple agreements governing distinct transactions, each of

which had their own forum selection clauses, and none of which contained integration language. *Milstein*, 412 So. 3d at 804. Here, by contrast, the EA and PIIA expressly integrate themselves and govern the same relationship.

NetApp cites *Harvey v. Lifespace Comms., Inc.*, 306 So. 3d 1248, 1251 (Fla. Dist. Ct. App. 2020), for the proposition that where there is no "intention to be bound" by the other agreement, the agreements cannot be integrated. NetApp Br. 32. But *Harvey* concerned whether an arbitration clause in a decades-old contract could be imported into a later agreement that did not include any integration or incorporation language, which the court declined to do absent an express agreement in the arbitration context. 306 So. 3d at 1250–51. The EA and PIIA are contemporary agreements, and contain express integration language. As the district court recognized, the PIIA "expressly contemplates that Stefánsson 'may be subject to' an 'employment agreement,'" and the integration language "goes sufficiently beyond the 'mere reference to another document'" that concerned the court in *Harvey*. *See* Doc. 142 at 4, 28–29.

#### 4. NetApp's Remaining Arguments Mischaracterize the EA and PIIA

NetApp variously argues that the PIIA and EA include "separately defined terms" (NetApp Br. 32, 48–51), have "different governing law and forum selection clauses" (*id.* at 32), the "PIIA survives termination" (*id.* at 33), there is "no PIIA preemption clause" (*id.* at 34), and "the [EA] applied only to NetApp Iceland" (*id.* at 35). But the unsurprising appearance of distinct content in portions of an integrated agreement does not override the explicit, shared language mutually identifying these portions as the entire, complete agreement between Stefánsson and NetApp.[7]

***Defined Terms.*** In an argument it failed to present to the district court, NetApp argues that the EA and PIIA both define "this Agreement" as themselves, which somehow defeats integration. NetApp Br. 32, 48–51. This argument is waived. *See generally* Doc. 66; Doc. 105. "[A] new-on-appeal theory based upon a contractual provision not referenced before the district court is waived." *OMV Assocs. Ltd. P'ship v. TriMont*

[7] In its pursuit of other former employees, NetApp refers to their employment agreements and PIIAs collectively as the "Agreements." Doc. 81-4.

*Real Est. Advisors, Inc.*, 484 F. App'x 299, 305 n.5 (11th Cir. 2012) (citing *Bridge Cap. Invs., II v. Susquehanna Radio Corp.*, 458 F.3d 1212, 1217 (11th Cir. 2006)) (confirming that a party can waive an argument based on a contractual provision); *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1170 (11th Cir. 2004) (declining to address argument "for the first time on appeal").

Regardless, NetApp's argument is irreconcilable with the integrated agreement's language. The EA and PIIA *expressly state* that they operate together as one complete agreement, and that the PIIA forms an integral part of the employment "Agreement." Doc. 36-2 ¶ 20.1; Doc. 1-2 ¶ M. The additional appearance of defined terms like "this Agreement" does not override the clear language that on its own resolves any question of integration. NetApp offers no authority or explanation for dismissing the integration language. *See* NetApp Br. 35–36.

***Different Venue Clauses.*** NetApp's reliance on differing venue-related clauses in the EA and PIIA fares no better. *Id.* at 33. As the district court properly observed, the law requires "harmoniz[ing]" two integrated agreements, and "[c]onstruing two documents together does not mean that every provision in one document necessarily becomes a

part of the other." Doc. 142 at 17–18. Of course, the presence of complementary provisions does not defeat integration. *Id.* at 24 (citing *Regalia, LLC v. Bankfirst*, 2009 WL 10656843, at *5 (S.D. Fla. May 8, 2009)). Here, the district court found that the EA forum selection clause is mandatory because it confers jurisdiction "exclusive[ly]," in Iceland. Doc. 142 at 22. The PIIA consent-to-jurisdiction clause, on the other hand, is permissive because there is no such exclusivity language.[8] *Id.* As noted above, NetApp concedes that a PIIA is sometimes executed independently of an employment agreement, in which case its permissive provisions may provide predictability as to where a dispute may be resolved. But when the PIIA is integrated into an overall employment agreement, as here, that permissive language necessarily gives way to a mandatory forum selection clause—especially where, as here, the EA itself states that it supersedes other covenants in other NetApp documents (Doc. 36-2 ¶ 20.4), and the PIIA in accordance states that it "shall not supersede any covenants entered into in connection with the Greenqloud acquisition." Doc. 1-2 at 1.

[8] The PIIA clause is "consistent" with the EA clause because it selects the jurisdiction where Stefánsson worked at the time he signed the PIIA: Iceland. Doc. 142 at 24–25.

***Survival.*** NetApp now suggests that integration is defeated because the EA was terminated when Stefánsson moved to Florida, while the PIIA survived. NetApp Br. 33–34. But NetApp previously conceded that the EA's mandatory forum selection survived termination and would still govern certain disputes today. Doc. 105 at 34:20–35:22. NetApp cannot abandon the argument it made to the district court and take an entirely contradictory position on appeal. *See Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1326–27 (11th Cir. 2004) (rejecting new argument "wholly different" from argument presented to district court). Regardless, NetApp cites no authority for its new argument, and for good reason—the law is to the contrary (both in Florida and Iceland). As discussed in Section I.C, *infra*, forum selection clauses are structural provisions that survive termination absent express language to the contrary. *See* Doc. 36 at 9–10; Doc. 36-9 ¶¶ 2.4–2.8; *Fla. PACE Funding Agency v. Pinellas Cnty.*, 385 So. 3d 631, 639 (Fla. Dist. Ct. App. 2024).

***Preemption.*** NetApp next tries to argue that although the "Agreement" (the EA) supersedes and preempts "NetApp policies, internal rules, guidelines, or regulations," it does not specifically list the

PIIA in that provision, so it must have been excluded from that list for a reason. NetApp Br. 34. Setting aside NetApp's attempt to raise yet another argument never presented to the district court, this argument ignores the structure of the EA and PIIA. First, the PIIA does subordinate itself to the EA, using customized language (not, as NetApp suggests, a standard form) that states it is "in addition to and shall not supersede any covenants entered into in connection with the Greenqloud acquisition, *even those that appear similar*." Doc. 1-2 at 1 (emphasis added). Second, NetApp offers no argument as to why the PIIA should not be considered one of its "policies," "guidelines," or "regulations" under Section 20.4 of the EA, and this language should be construed against NetApp, as the drafting party. Third, NetApp's argument ignores the fact that the EA already integrates the PIIA, so there would be no need to identify it as a separate subordinate document. The language NetApp cites confirms, rather than undermines, the integrated agreement, as the district court correctly recognized. Doc. 142 at 19.

***Application to NetApp Iceland.*** Finally, NetApp attempts to dodge the forum selection clause by claiming that the EA applied only to the NetApp Iceland entity. *See* NetApp Br. 35. In addition to improperly

relying on extrinsic evidence, this argument ignores the plain text of the EA. The EA states first that Stefánsson is employed by "the Company," defined to mean Greenqloud, which became part of the NetApp Group, defined as the worldwide "Company, its parent and their affiliates (including any and all NetApp entities)." Doc. 36-2 ¶¶ 1.1, 1.5. The EA then states that Stefánsson agreed to be bound by various NetApp global policies. *Id.* ¶¶ 1.4, 19.2. The EA thereafter would "remain in full force and effect should [Stefánsson] be transferred to a different part of NetApp." *Id.* ¶ 1.6. The EA, therefore, specifically states that Greenqloud became part of the "NetApp Group," that his duties under the EA were owed to all NetApp entities worldwide, and that those duties followed him to whichever NetApp entity he worked for.

Against this backdrop, NetApp's reliance on *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 237 (2d Cir. 2006) is misplaced. NetApp Br. 35. There, a shareholder tried to use federal motor vehicle law to avoid an arbitration agreement he signed, claiming it was a "motor vehicle franchise contract." *Id.* at 235. The Second Circuit disagreed because the agreement with the arbitration provision was a different agreement, involving distinctly different parties (General Motors Corp., a car

dealership, and an individual). *Id.* at 237. Further, the contracts did "not refer to each other." *Id.* Here, the EA and PIIA concern the same parties (a proposition NetApp adopted in the district court) and expressly cross-reference and incorporate one another, governing the same employment relationship.

### B. The Employment Agreement's Mandatory Forum Selection Clause Controls

Once the EA and PIIA are properly construed as a single integrated contract, the EA's mandatory Iceland forum selection clause applies to performance of the entire agreement, including the provisions of the PIIA. The EA's forum selection clause is mandatory, while the PIIA includes only a permissive consent-to-jurisdiction clause. The two clauses are complementary, not conflicting, and the mandatory provision controls. *See* Doc. 142 at 24.

The EA's Iceland forum selection clause is mandatory. It provides that the performance of the agreement "*will be* subject to the *exclusive* jurisdiction of the courts of Iceland." Doc. 36-2 ¶ 20.7 (emphasis added). As the district court found, the key inquiry in determining whether a forum selection clause is mandatory is whether it "designates an exclusive forum for the parties to litigate certain disputes." Doc. 142 at

22 (citing *Gold Crown Resort Mktg. Inc. v. Phillpotts*, 272 So. 3d 789, 793 (Fla. Dist. Ct. App. 2019)). That inquiry is straightforward here. The clause does not merely authorize suit in Iceland; it unambiguously requires that disputes be subject to the "exclusive jurisdiction" of Icelandic courts. Doc. 36-2 ¶ 20.7.

This Circuit enforces "only those clauses that unambiguously designate the forum in which the parties must enforce their rights under the contract." *Florida Polk Cnty. v. Prison Health Servs., Inc.*, 170 F.3d 1081, 1083 n.8 (11th Cir. 1999). As the district court noted, that is the case here. Doc. 142 at 22. Under federal, Florida, and Icelandic law, once a clause is mandatory, it is "presumptively valid and enforceable." *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009); *see also Mgmt. Computer Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So. 2d 627, 631 (Fla. Dist. Ct. App. 1999) ("As a general principle, the trial court must honor a mandatory forum selection clause in a contract in the absence of a showing that the clause is unreasonable or unjust"); Doc. 36-9 ¶ 1.9 (Icelandic law).

In contrast, the PIIA's consent-to-jurisdiction clause is permissive. It provides that signatories "consent to the personal jurisdiction and

venue in the state and federal courts of the country and county of the location in which I work as of the date hereof." Doc. 1-2 ¶ O. It does not "dictate[] an exclusive forum." *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011) (cleaned up). That is the hallmark of a permissive clause: "Absent words of exclusivity, a forum selection clause will be deemed permissive." *Michaluk v. Credorax (USA), Inc.*, 164 So. 3d 719, 722 (Fla. Dist. Ct. App. 2015); *see also Slater*, 634 F.3d at 1330 ("A permissive clause authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere"); *S&S Directional Boring & Cable Contrs., Inc. v. Am. Nat'l Bank of Minn.*, 961 So. 2d 1046, 1047 (Fla. Dist. Ct. App. 2007) ("[C]lauses that merely consent to jurisdiction and venue in the named forum and do not exclude jurisdiction or venue in any other forum are permissive.") (cleaned up).

As a result, the EA's Iceland forum selection clause governs because the two clauses are complementary, rather than conflicting, just as the district court found. Doc. 142 at 24. The PIIA does not contain its own mandatory forum selection clause that would conflict with the EA's exclusive designation of Iceland, and it affirms that it does not supersede the EA. Doc. 1-2 at 1. Federal common law, Florida law, and Icelandic

law are unanimous. *Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 762 (7th Cir. 2006) (in an integrated agreement, a "nonexclusive jurisdictional provision" does not "undermine[] a very strongly worded forum selection clause containing mandatory language"); *Williams IP Holdings, LLC v. Schwarz*, 394 So. 3d 199, 204 (Fla. Dist. Ct. App. 2024) ("A mandatory clause generally takes priority"); Doc. 36-9 ¶ 2.9 ("Under Icelandic contract law, when two agreements are expressly linked and one contains a governing law and venue clause, that clause will generally apply to disputes arising under both documents, unless the incorporated document contains a conflicting, overriding provision").

Even if it had any basis, NetApp's attempt to generate a conflict would fail, because the PIIA does not independently select Florida as the governing forum. *See* Doc. 142 at 25. Rather, the PIIA points to the same forum as the EA: Iceland. The PIIA's reference to the location in which Stefánsson worked "as of the date hereof" indicates Iceland, where he worked when he signed the agreement. *Id.* NetApp claims this would render other portions of the integrated agreement superfluous. NetApp Br. 12. But the PIIA's clause is not surplusage simply because the EA's

mandatory clause controls.[9] Rather, the PIIA clause continues to do work as a permissive consent-to-jurisdiction provision, while the EA's clause provides the exclusive forum rule for the integrated agreement.

NetApp's remaining attempts to justify lodging this case in Florida fail. NetApp advances another new argument, suggesting that the PIIA controls under the contractual canon that the "specific prevails over the general." NetApp Br. 50 (citing *Kel Homes v. Burris*, 933 So. 2d 699 (Fla. Dist. Ct. App. 2006)). But *Kel Homes* does not support NetApp. There, two clauses were in direct conflict: one broadly required arbitration of disputes, while another specifically authorized an action for specific performance upon a particular default. 933 So. 2d at 701–02.[10] Because

---

[9] NetApp cites *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1242 (11th Cir. 2009) in support of this surplusage argument, saying that the district court failed to "afford all contractual provisions meaning." NetApp Br. 4, 26, 33. But that decision involved the question of whether the term "cost plus" should be interpreted differently from "cost" in a services contract (*Equity Lifestyle Props.,* 556 F.3d at 1241–42)—here, NetApp identifies no word supposedly ignored by the district court.

[10] The same is true for *Ibis Lakes*, which considers two provisions that directly conflict, rather than complement one another. *See* NetApp Br. 50 (citing *Ibis Lakes Homeowners Ass'n, Inc. v. Ibis Isle Homeowners Ass'n, Inc.*, 102 So. 3d 722 (Fla. Dist. Ct. App. 2012)). *Ibis Lakes* is even further afield—a general arbitration clause applied over a specific arbitration clause because the claim did not fall within the specific clause. *Id.* at 728–

the provisions could not be harmonized, the court had to determine which controlled. *Id.* Here, the two clauses are not in conflict. Regardless, NetApp's suggestion that the PIIA "supplies the specifics of the confidentiality obligations" (NetApp Br. 50) ignores the construction of the integrated agreement: (1) the EA contains those same confidentiality obligations, which are merely supplemented in the PIIA, and (2) unlike in *Kel Homes*, the integrated agreement here contains express internal rules of construction where the EA's terms supersede, so there is no basis to invoke the "specific controls over the general" rule.

### C. The Iceland Forum Selection Clause Survives Termination of the Employment Agreement

Given that the EA and PIIA are integrated and that the EA's mandatory forum selection provision applies, NetApp now questions whether the termination of the EA when Stefánsson moved to Florida impacts the enforceability of the provision. It does not. Under federal,

29. The court noted: "the *ejusdem generis* doctrine is employed within contract law to resolve differences inherent in conflicting contract provisions, thereby clarifying a party's obligations, not to obliterate general provisions that do not directly conflict with specific provisions." *Id.* at 728.

Florida, and Icelandic law, the EA's forum selection clause survives termination because it is a "structural" contract provision.

That rule is well established under federal, Florida, and Icelandic law. As Stefánsson's Icelandic law expert explained, "[u]nless the contract expressly states otherwise, provisions regarding governing law and jurisdiction are typically interpreted to apply to any disputes arising out of or relating to the agreement, including those that arise after termination." Doc. 36-9 ¶¶ 2.4–2.8. Florida law is the same: "Absent express language in an agreement to the contrary, forum selection clauses are not extinguished by termination," and such clauses "do[] not require a 'savings clause' to survive termination any more than does an arbitration clause." *Fla. PACE Funding Agency*, 385 So. 3d at 638–39 (cleaned up). Federal law likewise recognizes that provisions governing dispute resolution are "structural" and may survive termination even where other contractual obligations do not. *See, e.g.*, *Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 857 (11th Cir. 2016);[11] *see*

---

[11] NetApp suggests that *Silverpop* discusses the proper interpretation of structural clauses only "in passing" or dictum (NetApp Br. 41), but this is not accurate: this Court considered at length the differences between performance obligations that may expire on termination absent a

*also United States v. Cincinnati Ins. Co.*, 2022 WL 1801193, at *3 (M.D. Fla. Mar. 25, 2022) (finding forum selection clause survived agreement's termination); *Sensify (US) Inc. v. Intelligent Telematics N. Am., Inc.*, 2017 WL 1541424, at *2 & n.2 (S.D. Fla. Apr. 28, 2017) (same).

Against this settled backdrop, NetApp's argument concerning the lack of an express survival provision fails. NetApp Br. 39–42. NetApp cites inapposite cases, where a forum selection clause does not survive because *a subsequent agreement* containing merger and integration clauses *expressly extinguishes* "all prior agreements." *Id.* at 39 (citing *Junction Sols., LLC v. MBS DEV, Inc.*, 2007 WL 114306, at *5 (N.D. Ill. Jan. 9, 2007)). There is no such subsequent agreement here, so the default rule is the opposite: forum selection clauses, as structural clauses as opposed to "performance" clauses that may require survival language, survive unless expressly displaced. *See Silverpop*, 641 F. App'x at 858

---

survival clause, and structural clauses that do not. 641 F. App'x at 856–58. It would make little sense to interpret a structural provision relating to choice of law or dispute resolution as only applying *before* termination, especially when that provision was far more likely to matter to the parties *after* termination. *Id.* at 858 ("There is no cogent reason why the parties would have elected to apply the law of a particular state to a dispute litigated while the agreement was in force but have allowed for uncertainty as to the state law that would govern any dispute litigated following the termination of the agreement.").

("[C]onstruing the survival clause as limited to the performance obligations of the agreement properly gives meaning to the relevant provisions."). To require a separate survival clause would invert that rule and render such provisions redundant: it would otherwise make no sense to include a savings clause in the EA's forum selection clause because the forum selection clause survives unless explicitly ended. *See, e.g.*, *Cincinnati Ins. Co.*, 2022 WL 1801193, at *3 (also finding that "the forum selection clause itself has no language that indicates that it becomes unenforceable upon termination") (cleaned up).[12]

NetApp's argument on appeal concerning termination is not only wrong on the merits, it contradicts what NetApp conceded below. At the motion to dismiss hearing, NetApp's counsel agreed that the forum selection clause survives termination of the EA. Counsel stated:

> But I will also say it's not necessary for the Court to reach that determination, because the forum selection clause that would govern -- I do agree it survives the Icelandic agreement

[12] The other cases NetApp cites are similarly distinguishable, either because they are decided under California law, or because they involve an express survival provision stating that it is listing all of the provisions that are intended to survive. *See, e.g.*, *TSI USA, LLC v. Uber Techs., Inc.,* 2017 WL 106835, at *8 (N.D. Tex. Jan. 11, 2017) (California law); *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*, 2019 WL 2017541, at *6 (E.D. Va. May 7, 2019) (clause lists all surviving provisions).

> and would govern any suit on the Icelandic agreement related to Icelandic employment. If there was some dispute about union rights or something related to the Icelandic employment, of course a breach of that agreement, the forum selection clause would survive and control that.

Doc. 105 at 34:20–35:2; *see also* Doc. 142 at 30.

NetApp ignores this concession, but it offers no authority to support a different rule. NetApp Br. 41–42. Nor could it. Nothing in the parties' integrated agreement purports to extinguish the forum selection clause upon termination, and absent such language, the clause remains operative.

## II. The Mandatory Forum Selection Clause Applies to This Dispute

The only remaining question is whether NetApp's claims fall within the scope of the EA's mandatory forum selection clause. They do. NetApp's claims in this action, regardless of their particular articulation, arise from the same alleged conduct and the same responsibilities premised on Stefánsson's employment with NetApp. That relationship is unquestionably governed by the EA, so the EA's Iceland forum selection clause applies. *See* Doc. 142 at 30–31.

### A. The Forum Selection Clause Applies to Claims Arising from Stefánsson's Performance of the Integrated Agreement

A forum selection clause is "presumptively valid and enforceable" and "carries near-determinative weight" of the proper forum. *Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd*, 722 F. App'x 870, 883 (11th Cir. 2018) (cleaned up). Forum selection clauses are "broadly construed." *Frida Kahlo Corp. v. Pinedo*, 2021 WL 4147876, at *2 (S.D. Fla. Sept. 13, 2021). The EA's forum selection clause states that "[t]he construction, performance, interpretation and validity of this Agreement will be governed by and construed in accordance with the laws of Iceland and will be subject to the exclusive jurisdiction of the courts of Iceland." Doc. 36-2 ¶ 20.7. This clause applies to any dispute relating to Stefánsson's performance of the parties' contractual relationship. That is this case. *See Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1331 (11th Cir. 2011) (forum selection clause "governs the entirety of the employment relationship" between the parties because it was "expressly applicable to 'all claims or causes of action relating to or arising from [the employment agreement]'").

NetApp's claims are premised on its theory that Stefánsson, while employed by NetApp and subject to the integrated EA and PIIA, owed certain duties relating to confidentiality, intellectual property, and post-employment conduct, and that he violated those duties. Those are obligations defined by the integrated agreement. *See* Doc. 142 at 30 (district court holding that "the mandatory forum selection clause in Stefánsson's employment agreement governs his performance under both agreements"). Despite protests to the contrary, *see, e.g.*, NetApp Br. 45, NetApp's claims concern contractual performance (a term expressly used in the forum selection clause) under the integrated agreement.

### B. The Forum Selection Clause Applies to NetApp's Breach of Contract Claims

NetApp's breach of contract claims fall squarely within the Iceland forum selection clause. Those claims are premised entirely on the assertion that Stefánsson failed to comply with obligations created by the EA and PIIA. Doc. 1 ¶¶ 47–49, 61. The forum selection clause governs disputes regarding the "performance" of the integrated agreement. Doc. 36-2 ¶ 20.7. Claims alleging that Stefánsson misused NetApp's information or violated post-employment restrictions necessarily concern

his "performance" under the integrated EA and PIIA, and the Iceland forum selection clause applies. *See* Doc. 142 at 33–34.

NetApp cannot avoid that result by citing only to the PIIA in the Complaint, and asking the Court to ignore that it is an "integral part" of the EA. *See* NetApp Br. 45. NetApp cannot contend that the scope of the forum selection clause in the integrated agreement is limited to obligations under the EA, especially where the EA outlines the same intellectual property obligations covered in the PIIA, which is intended to be only "in addition to," and not to "supersede," those obligations. Doc. 1-2 at 1. Because NetApp's breach claims depend entirely on Stefánsson's alleged failure to perform obligations arising from that integrated agreement, they fall within the clause's scope.

### C. The Forum Selection Clause Applies to NetApp's Statutory Claims

NetApp's DTSA and FUTSA claims likewise fall within the scope of the Iceland forum selection clause because they arise from the same alleged conduct and the same employment-based duties that underlie the breach of contract claim. NetApp attempts to treat its statutory claims as though they stand apart from the integrated agreement, essentially arguing that because statutory remedies for alleged trade secrets

misappropriation exist, a contract between the parties contemplating confidentiality should be treated as superfluous. NetApp Br. 45–46. Nothing NetApp cites suggests this result, and it is not the law.

Instead, when determining "whether an agreement's forum-selection clause applies to non-contractual claims, courts have considered whether there is a significant and obvious nexus between the claims and the agreement." *Baker v. Econ. Rsch. Servs., Inc.*, 242 So. 3d 450, 455 (Fla. Dist. Ct. App. 2018) (cleaned up). Such a nexus exists between a claim and a contract "if the claim presents circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract." *Id.* (cleaned up). "[A] claim has a nexus to a contract and arises from the terms of the contract if it emanates from an inimitable duty created by the parties' unique contractual relationship." *Id.*; *see also Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987), *aff'd and remanded*, 487 U.S. 22 (1988) (finding that forum selection clause applied to extra-contractual claims and observing "[c]ommercial contractual issues are commonly intertwined with claims in tort or criminal or antitrust law"). NetApp executed an employment contract with Stefánsson specifying his

performance-related duties including those relating to trade secrets. The law enforces a forum selection clause in that contract for claims relating to trade secret issues, whether contractual or statutory.

NetApp's Complaint reinforces this point. NetApp alleges in each of its statutory trade-secret claims that Stefánsson "obtained the trade secrets" he allegedly misappropriated "pursuant to the PIIA." Doc. 1 ¶¶ 69, 80, 95, 105. It also incorporates the same factual allegations to support both its contractual and statutory claims. *Id.* ¶¶ 44, 58, 64, 75, 90, 100 (incorporating by reference allegations in ¶¶ 1–43). Indeed, the same factual allegations are threaded throughout the Complaint in support of all of NetApp's claims, alleging that Stefánsson purportedly obtained trade secrets as part of his performance under his agreement, and then supposedly misappropriated them during the performance of his contractual duties at NetApp.

NetApp attempts to run away from its pleading by asserting that the statutory claims do not require breaching the integrated agreement, NetApp Br. 48 n.8, but NetApp cited the PIIA throughout each statutory claim. *See, e.g.*, Doc. 1 ¶¶ 69, 95. Regardless, that is not the relevant inquiry under the parties' agreement—the question is whether the claims

relate to Stefánsson's *performance* under the EA and PIIA, which NetApp's own pleading concedes. *See id.* ¶¶ 69, 80, 95, 105 (alleging statutory claims under 18 U.S.C. § 1836 *et seq.* and Fla. Stat. § 688.001 *et seq.*, on basis of Stefánsson "obtain[ing] the trade secrets pursuant to the PIIA, and thus, he received the trade secrets under circumstances which gave rise to a duty to maintain the secrecy of the information or limit its use."); *see also* 18 U.S.C. § 1839 (defining "misappropriation" and "improper means" to include use or acquisition of a trade secret under a duty to maintain secrecy); Fla. Stat. § 688.002 (same). NetApp cites no cases where courts have severed statutory claims of this nature from the tether of a forum selection clause, let alone where the basis of the duties alleged is formed in the parties' contract. *See Slater*, 634 F.3d at 1331 (statutory whistleblower claims fell within scope of forum selection clause contained in agreement governing employee's performance).[13]

---

[13] The other authority cited by NetApp simply states that a trade secrets claim can be brought, even when there is no contractual nondisclosure obligation. NetApp Br. 47 (citing *Lee v. Cercoa, Inc.*, 433 So. 2d 1, 2 (Fla. Dist. Ct. App. 1983). But this uncontroversial principle has no bearing here, where NetApp expressly alleged that Stefánsson obtained the purported trade secrets as a result of his integrated agreement. Similarly, although NetApp tries to distinguish *Gold Crown Resort Mktg. Inc. v. Phillpotts*, 272 So. 3d 789 (Fla. Dist. Ct. App. 2019) (cited in

## III. The District Court Properly Dismissed the Case Under the Doctrine of *Forum Non Conveniens*

The doctrine of *forum non conveniens* warrants dismissal where the parties contracted to litigate in a different forum. *Turner v. Costa Crociere S.p.A.*, 9 F.4th 1341, 1347 (11th Cir. 2021); *see also* Doc. 142 at 38. Under the law of this Circuit, a *forum non conveniens* dismissal is appropriate where "(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *Turner*, 9 F.4th at 1347 (citing *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1028 (11th Cir. 2014)). However, that framework is modified where a valid forum selection clause governs. *Id.*

In *Atlantic Marine*, the Supreme Court set forth the proper treatment of an applicable and valid forum selection clause. *Atl. Marine*, 571 U.S. at 62. That clause "should be given controlling weight in all but the most exceptional cases," "the plaintiff's choice of forum merits no

---

NetApp Br. 48 n.8), the Florida court there found that the statutory claims were subject to the forum selection clause because, "those claims relate[d] to the *performance* of the agreements," *id.* at 793 n.7, the same language used in the EA's forum selection clause. Doc. 36-2 ¶ 20.7.

weight," and the court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.* at 63–64. The plaintiff "bears the burden of showing exceptional circumstances, predicated on public-interest considerations, to justify disturbing the clause." *Aviation One of Fla.*, 722 F. App'x at 883 (citing *id.* at 64); *Turner*, 9 F.4th at 1348 (finding that plaintiff failed to present evidence sufficient to meet heavy burden of proof to negate forum selection clause). That is because "in all but the most unusual cases . . . the interest of justice is served by holding parties to their bargain." *Atl. Marine*, 571 U.S. at 69 (cleaned up) (cited in Doc. 142 at 39). Ignoring this law, NetApp proceeds as though the Court should apply the ordinary *forum non conveniens* test despite the valid forum selection clause. NetApp Br. at 54. *Atlantic Marine* controls under any analysis, but NetApp has not and cannot meet its burden. Doc. 142 at 38. NetApp does not identify any circumstance—let alone an extraordinary one—that would justify disregarding the parties' agreement.

### A. Iceland is an Adequate and Available Forum

Ordinarily, to determine whether dismissal is warranted based on *forum non conveniens*, the Court considers whether "an adequate

alternative forum is available." *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1330 (11th Cir. 2011). Because of the forum selection clause in the integrated agreement, NetApp's "choice of forum merits no weight." *Turner*, 9 F.4th at 1348 (citing *Atl. Marine*, 571 U.S. at 63). Nonetheless, even under the standard *forum non conveniens* analysis that NetApp invokes, Iceland is both available and adequate.

Courts "declare unenforceable choice clauses only when the remedies available in the chosen forum are so inadequate that enforcement would be fundamentally unfair." *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1297 (11th Cir. 1998) (cleaned up). Put another way, an alternative forum is inadequate only in the rare circumstance where "the remedy provided by th[at] alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Tazoe*, 631 F.3d at 1330–31 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)). A foreign forum is sufficient so long as it offers some remedy, even if not identical to those in U.S. courts. *Id.*

NetApp has never argued—below or on appeal—that Iceland does not provide a remedy, nor does NetApp address whether Iceland is an adequate and available forum. NetApp Br. at 54 (not addressing this

factor); *see also* Doc. 142 at 17–18, 37. That alone is a concession to the forum selection clause. *Aviation One of Fla.*, 722 F. App'x at 885 (plaintiff agreed to forum where it "presented no evidence that England was not an adequate or available alternative forum").

Given NetApp's concession, Iceland (the forum NetApp itself chose in the integrated agreement) is plainly both an available and adequate forum. A forum is "inadequate" only where it provides "no remedy at all." *Tazoe*, 631 F.3d at 1330–31. That does not apply here. As the district court observed (in addressing, out of an abundance of caution, a possible objection NetApp failed to make), Icelandic courts are competent to adjudicate breach-of-contract and trade-secret claims and can provide a remedy if liability is established. Doc. 142 at 37. Icelandic law recognizes similar causes of action and provides remedies for disputes of this nature. Doc. 36-9 ¶ 1.6. Nothing in the record suggests that NetApp would be deprived of its legal remedies or cannot pursue its claims there. *See* Doc. 81-4 (threatening legal action in Iceland against colleague of Stefánsson).

Having conceded the adequacy of Iceland below, NetApp now argues for the first time on appeal that its inability to litigate identical DTSA or FUTSA claims in Iceland makes the district court's ruling

somehow "unreasonable and unjust." NetApp Br. at 57–58. That argument is not properly before the Court. *Access Now, Inc.*, 385 F.3d at 1331. It also fails on the merits. Whether Iceland is an adequate and available forum turns on whether it provides a remedy, not whether it provides identical statutory causes of action. *Tazoe*, 631 F.3d at 1330. Courts routinely enforce forum selection clauses even where the foreign forum does not provide the same statutory remedies available in U.S. courts. *See, e.g.*, *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1288 (11th Cir. 2021) (RICO claim); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 952 (11th Cir. 1997) (same); *Turner*, 9 F.4th at 1349 (affirming dismissal of state law claims on basis of valid and enforceable forum clause). Moreover, NetApp's Icelandic expert opined that the Icelandic "Act on Trade Secrets" was available to provide remedies in Iceland. Doc. 36-9 ¶¶ 1.6, 2.14 (citing Icelandic Act on Trade Secrets No. 58/2021). NetApp's position would nullify forum selection clauses in all cases asserting U.S. statutory claims. That is not the law.

NetApp is thus reduced to pointing to potential procedural differences, including the availability of preliminary injunctive relief and

forms of discovery. NetApp Br. at 56–58. NetApp speculates, without support, that it *might* not have the resources it needs for these claims. Such conjecture falls far short of establishing that Iceland provides "no remedy" or is otherwise inadequate. *Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1354 (11th Cir. 2020); *see also Piper Aircraft*, 454 U.S. at 254. Moreover, limitations on discovery do not make a forum insufficient. *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001) (rejecting objection based on "lack of discovery in Argentine courts" because "[s]ome inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate") (cleaned up).

### B. The Balancing of Factors Confirms That Iceland is the Proper Forum

The valid forum selection clause obviates any further analysis of private factors. *See Turner*, 9 F.4th at 1348 (citing *GDG Acquisitions*, 749 F.3d at 1028) ("A binding forum selection clause requires the court to find that the *forum non conveniens* private factors entirely favor the selected forum."); *see also* Doc. 142 at 38. But even if the Court were to consider private interest factors along with the public interest factors, all

heavily favor dismissal for *forum non conveniens*. *See Tazoe*, 631 F.3d at 1331.

**Public Interest Factors Favor Dismissal.** The public-interest factors will "rarely defeat" enforcement of a valid forum selection clause, *Atl. Marine*, 571 U.S. at 64; *see also Aviation One*, 722 F. App'x at 883, and certainly cannot do so here. Relevant considerations include "the familiarity of the court(s) with the governing law, the interest of any foreign nation in having the dispute litigated in its own courts, and the value of having local controversies litigated locally." *Pierre–Louis v. Newvac Corp.*, 584 F.3d 1052, 1056 (11th Cir. 2009). All favor dismissal. As the EA choice of law clause mandates, Doc. 36-2 ¶ 20.7, this dispute is governed by Icelandic law, about which Iceland courts are "infinitely more familiar." *Jiangsu Hongyuan Pharm. Co. v. DI Glob. Logistics Inc.*, 159 F. Supp. 3d 1316, 1328 (S.D. Fla. 2016) (finding public interests favored dismissal where "dispute [was] governed by Chinese law, with which Chinese courts are infinitely more familiar than this Court."). As the parties contracted to litigate in Iceland and Stefánsson is a citizen of Iceland, Iceland "has a stronger interest in having this dispute litigated in its courts." *Id.*; *see also Tazoe*, 631 F.3d at 1334. Additionally, the

defendant and the other former NetApp employees central to NetApp's allegations are all located in Iceland, as is their employer (to which NetApp alleges they conveyed information), creating "a local interest in having localized controversies decided at home." *Wagner v. Island Romance Holidays, Inc.*, 984 F. Supp. 2d 1310, 1316–17 (S.D. Fla. 2013). NetApp's mis-framing of this as a dispute centered in Florida ignores that the alleged conduct, witnesses, and relevant entities are located in Iceland. NetApp is a Delaware corporation headquartered in California, not Florida. Doc. 1 ¶ 15.[14]

**Private Factors Favor Dismissal**. As noted above, the valid forum selection clause obviates any further analysis of private factors, but they nevertheless weigh heavily in favor of dismissal.

First, the alleged misconduct took place in Iceland. Stefánsson resides in Iceland, and Red Stapler is registered and operates solely in

---

[14] NetApp cites *Monarch Claims Consultants, Inc. v. Fleming*, 372 So. 3d 758, 762 (Fla. Dist. Ct. App. 2023) to argue that courts should not transfer "local disputes" to foreign forums (NetApp Br. 28), but *Monarch* declined to rule on that issue because it found the original contract void. *Id.* Notably, *Monarch* is otherwise contrary to NetApp's arguments, observing that if the terminated contract had not been void, its "forum selection clause may still be enforced even after a contract has been terminated." *Id.* at 763 n.2.

Iceland. Doc. 36-1 ¶¶ 11, 13–14. NetApp alleges that it was through the creation of Red Stapler and its later acquisition by VAST that Stefánsson breached the PIIA and misappropriated NetApp's trade secrets. Where the relevant witnesses (Red Stapler employees) are in Iceland, the private factors favor Iceland. *See Tazoe*, 631 F.3d at 1332 (finding private factors favored Brazilian forum where evidence and witnesses were in Brazil). NetApp does not address any of these considerations, instead only stating that the Court should defer to NetApp's preference to ignore its own contract and seek a U.S. forum. NetApp Br. at 55–56.[15] As the district court recognized, "simply filing suit under federal and state law is not sufficient to defeat an otherwise valid forum selection clause." Doc. 142 at 40 (citing *Don't Look*, 999 F.3d at 1299).

Moreover, the PIIA's permissive forum selection clause also favors dismissal and venue in Iceland. NetApp attempts to bat the clause aside

---

[15] NetApp's cited case is inapposite. In *Esfeld v. Costa Crociere, S.P.A.*, this Court discussed the various relevant federal interests in the *forum non conveniens* context, which specifically includes "the federal government's interest in foreign relations." 289 F.3d 1300, 1312–13 (11th Cir. 2002). Such an interest goes to international comity, and the foreign forum's interest in the dispute. *Id.* NetApp cites *Esfeld* for the proposition that "there is a strong federal interest in making sure" that a plaintiff "generally gets to choose an American forum," NetApp Br. 55, but that ignores that NetApp originally chose an Icelandic forum.

as "irrelevant" (NetApp Br. 52), but a permissive forum selection clause is still a factor in the private-interest analysis. *See, e.g.*, *J.C. Renfroe & Sons, Inc. v. Renfroe Japan Co.*, 515 F. Supp. 2d 1258, 1270 (M.D. Fla. 2007) (private interest factors favored dismissal in case with permissive forum selection clause).

### C. NetApp Will Not Face Undue Burden Or Prejudice in an Icelandic Forum

NetApp argues that an Icelandic forum will cause "undue prejudice" due to the potential lack of procedural protections in Iceland. NetApp Br. 56. But Iceland's procedural protections (which it deems appropriate in proceedings involving its citizens) do not prevent a "remedy" for NetApp—which is all that matters. Following a court's procedures in a venue where one contractually agreed to file suit is not undue burden or prejudice. To the contrary, requiring Stefánsson to litigate further in a forum he did not contractually agree to, does not reside in, and to which he no longer has any connection would impose further burden and prejudice on him.

NetApp repeats its assertion that Iceland's lack of *identical* statutes means litigating there would be unfair. *Id.* at 57–59. For the same reasons stated in Section III.A above, this argument was not raised below

and fails on the merits, because courts routinely enforce forum selection clauses even where the foreign forum does not provide identical statutory remedies.

NetApp also suggests that Icelandic courts may lack authority to adjudicate certain aspects of this dispute. *Id.* at 56. This is not supported by the record. The district court expressly rejected NetApp's characterization of its expert testimony on that point. Doc. 142 at 36. NetApp's speculation about potential differences in Icelandic proceedings does not establish inadequacy of that forum.

## CONCLUSION

For these reasons, the district court's dismissal for *forum non conveniens* should be affirmed.

Dated: April 22, 2026

Respectfully submitted,

*/s/ Ian M. Ross*

Ian M. Ross
iross@sidley.com
SIDLEY AUSTIN LLP
830 Brickell Plaza
Miami, Florida 33131
Telephone: (305) 391-5100

Nathaniel C. Love
Jennifer M. Wheeler
Abigail Bachrach

nlove@sidley.com
jwheeler@sidley.com
abachrach@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000

*Counsel for Appellee Jón Thorgrímur Stefánsson*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 12,980 words.

2. This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Ian M. Ross*
Ian M. Ross

## CERTIFICATE OF SERVICE

I certify that on April 22, 2026, this brief was filed with the Clerk of the Court through the Court's CM/ECF system, which will send notice to all registered CM/ECF users.

*/s/ Ian M. Ross*
Ian M. Ross