No. 26-10482

# United States Court of Appeals for the Eleventh Circuit

NETAPP, INC.,

*Appellant*,

v.

JÓN THORGRÍMUR STEFÁNSSON,

*Appellee*.

On Appeal from the
United States District Court for the Middle District of Florida,
No. 6:25-cv-02130-JSS | Hon. Julie S. Sneed

## APPELLANT NETAPP, INC.'S REPLY BRIEF


Elizabeth A. Kiernan
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
(214) 698-3100

Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Suite 1200
Irvine, CA 92612
(949) 451-3800
*bevanson@gibsondunn.com*

Aly Cox
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500

Katherine K. Vidal
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
(202) 282-5000

*Counsel for Appellant NetApp, Inc.*


May 13, 2026

# TABLE OF CONTENTS

Page


Table of Citations ..... iii

Introduction ..... 1

Argument ..... 4

I. The Terminated Employment Agreement Is Inoperative and Does Not Apply to the Claims in This Case. ..... 4

A. The PIIA Is a Separate Contract Independent of the Terminated Employment Agreement. ..... 5

1. The Parties Designed the Agreements to Govern Different Relationships. ..... 5

2. Other Textual Provisions Reinforce that the PIIA Is Independent of the Employment Agreement. ..... 9

3. Neither Agreement Expressly Integrates the Other, and Stefánsson's Contrary Reading Renders Many Provisions Meaningless. ..... 13

B. The Icelandic Forum-Selection Clause Terminated with the Employment Agreement. ..... 16

C. None of NetApp, Inc.'s Claims Fall Within the Terminated Employment Agreement's Forum-Selection Clause. ..... 22

II. The District Court and Stefánsson Apply the Wrong Legal Standard for *Forum Non Conveniens*. ..... 26

A. Stefánsson Has Not Shouldered His Burden to Demonstrate that Litigating in Florida Would Be a "Material Injustice." ..... 27

**TABLE OF CONTENTS**
**(continued)**

Page

B. It Would Be Unreasonable to Apply the Icelandic Clause to the Statutory Claims. .......... 30

Conclusion .......... 33

Certificate of Compliance .......... 35

Certificate of Service .......... 36

## TABLE OF CITATIONS

Page(s)

### Cases

*AQuate II LLC v. Myers*,
100 F.4th 1316 (11th Cir. 2024) ........................................................ 26

*Arciniaga v. Gen. Motors Corp.*,
460 F.3d 231 (2d Cir. 2006) ................................................................. 7

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
571 U.S. 49 (2013) ................................................................................ 26

*Bahamas Sales Assoc., LLC v. Byers*,
701 F.3d 1335 (11th Cir. 2012) ........................................................... 23

*Bailey v. ERG Enters., LP*,
705 F.3d 1311 (11th Cir. 2013) ............................................................. 4

*Baker v. Econ. Rsch. Servs. Inc.*,
242 So. 3d 450 (Fla. Dist. Ct. App. 2018) ........................................... 24

*Bridge Cap. Invs., II v. Susquehanna Radio Corp.*,
458 F.3d 1212 (11th Cir. 2006) ........................................................... 11

*Clayton v. Howard Johnson Franchise Sys., Inc.*,
954 F.2d 645 (11th Cir. 1992) ............................................................. 15

*Daewoo Motor Am., Inc. v. Gen. Motors Corp.*,
459 F.3d 1249 (11th Cir. 2006) ............................................................. 4

*ECB USA, Inc. v. Chubb Ins. Co. of N.J.*,
113 F.4th 1312 (11th Cir. 2024) ............................................... 8, 11, 13

*In re FFS Data, Inc.*,
776 F.3d 1299 (11th Cir. 2015) ........................................................... 14

**TABLE OF CITATIONS**
**(continued)**

Page(s)

*Fla. Inv. Grp. 100, LLC v. Lafont*,
271 So. 3d 1 (Fla. Dist. Ct. App. 2019) .... 10

*Fla. PACE Funding Agency v. Pinellas Cnty.*,
385 So. 3d 631 (Fla. Dist. Ct. App. 2024) .... 21

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*,
377 F.3d 1164 (11th Cir. 2004) .... 11

**In re Gardinier, Inc.*,
831 F.2d 974 (11th Cir. 1987) .... 5, 9, 13, 15

*Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*,
910 F.3d 1186 (11th Cir. 2018) .... 10, 31

*Holmes v. Fla. A & M Univ.*,
260 So. 3d 400 (Fla. Dist. Ct. App. 2018) .... 19

*Leon v. Millon Air, Inc.*,
251 F.3d 1305 (11th Cir. 2001) .... 27

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972) .... 27, 30

*Milstein v. Nicklaus*,
412 So. 3d 802 (Fla. Dist. Ct. App. 2025) .... 23, 24

*NuCurrent Inc. v. Samsung Elecs. Co., Ltd.*,
2019 WL 2776950 (S.D.N.Y. July 2, 2019) .... 21

*OMV Assocs. Ltd. P'ship v. TriMont Real Est. Advisors, Inc.*,
484 F. App'x 299 (11th Cir. 2012) .... 11

**Otto Candies, LLC v. Citigroup, Inc.*,
963 F.3d 1331 (11th Cir. 2020) .... 26, 27, 28, 30

**TABLE OF CITATIONS**
**(continued)**


Page(s)

*Pier 1 Cruise Experts v. Revelex Corp.*,
929 F.3d 1334 (11th Cir. 2019) .......... 15

*Polyflow, LLC v. Specialty RTP, LLC*,
2016 WL 6909383 (S.D. Tex. May 17, 2016) .......... 18

*Romano v. John Hancock Life Ins. Co. (USA)*,
120 F.4th 729 (11th Cir. 2024) .......... 18

*Samara v. Taylor*,
38 F.4th 141 (11th Cir. 2022) .......... 6

*SE Prop. Holdings, LLC v. Welch*,
65 F.4th 1335 (11th Cir. 2023) .......... 12

*Sensify (US) Inc. v. Intelligent Telematics N. Am., Inc.*,
2017 WL 1541424 (S.D. Fla. Apr. 28, 2017) .......... 21

*Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*,
641 F. App'x 849 (11th Cir. 2016) .......... 20

*Slater v. Energy Servs. Grp. Int'l, Inc.*,
634 F.3d 1326 (11th Cir. 2011) .......... 24

*SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*,
382 F.3d 1097 (11th Cir. 2004) .......... 28

*Stewart Org., Inc. v. Ricoh Corp.*,
810 F.2d 1066 (11th Cir. 1987) .......... 24

*United States v. Cincinnati Ins. Co.*,
2022 WL 1801193 (M.D. Fla. Mar. 25, 2022) .......... 21

*Werner Enters., Inc. v. Mendez*,
362 So. 3d 278 (Fla. Dist. Ct. App. 2023) .......... 25

## INTRODUCTION

NetApp, Inc. accuses Stefánsson of stealing its intellectual property in Florida while he was a Florida resident, years after the parties terminated his Icelandic employment agreement. Yet the district court enforced a forum-selection clause in that now-terminated employment agreement, and dismissed NetApp, Inc.'s claims. This was clear legal error, and this Court should reverse.

NetApp, Inc. asserts a breach of a separate agreement, the Proprietary Information, Inventions, and Non-Solicitation Agreement ("PIIA"), as well as statutory claims under federal and Florida law. The complaint does not assert, or even *mention*, the Icelandic employment agreement; and none of the claims in this case rely on the employment agreement in any way. Stefánsson's brief on appeal does not grapple with these fundamental errors in the district court's decision, and instead resorts to misrepresenting the record and the provisions of the two agreements.

For starters, Stefánsson is incorrect in saying (at 27–28) that the employment agreement and the PIIA regard the "same transaction" and govern "the same employment relationship." Although executed contem-

poraneously, each agreement controls a different relationship—the employment agreement governed Stefánsson's relationship with NetApp Iceland while he was employed there, while the PIIA governs Stefánsson's relationship with the broader suite of NetApp entities. The PIIA is designed to follow Stefánsson's employment, no matter which NetApp entity employs him, while the employment agreement was tied to, and designed to be terminable with, his employment at NetApp Iceland.

Stefánsson's argument to the contrary relies on a single adjective in the terminated employment agreement—"integral"—which he takes out of context and elevates above every other contrary provision in both agreements. The contracts could not be clearer that they are separate agreements governing different relationships, and Stefánsson's reading would disregard their distinct and separate choice-of-law and forum-selection clauses, their defined terms, and their differing scopes.

Even if Stefánsson were right that the employment agreement and the PIIA were originally an "integrated" contract (he is not), he *concedes* (at 15) that he "agreed to terminate the [employment agreement]" in 2022 when he moved to Florida to work for U.S.-based NetApp, Inc. as an at-

will employee subject to "no new employment agreement." That concession is dispositive: a forum-selection clause in a terminated employment agreement concerning Icelandic employment cannot plausibly control where NetApp, Inc. could sue years later when Stefánsson launched a competing venture and misappropriated NetApp's proprietary information while employed in Florida by a U.S. company in 2025. The only contract still in force at that time was the PIIA, which demands application of Florida law and permits Florida jurisdiction.

And even if the agreements were once integrated and even if the employment agreement somehow survived termination, the forum-selection clause in the employment agreement does not apply to the claims in this case. By its terms, the clause is limited to claims dependent on the construction or performance of the employment agreement itself. None of NetApp, Inc.'s claims depends on that agreement.

In short, Stefánsson cannot rely on a narrow forum-selection clause in a terminated agreement to avoid Florida jurisdiction for federal and Florida claims alleging harm he caused in Florida to his U.S. employer. This Court should reverse.

## ARGUMENT

### I. The Terminated Employment Agreement Is Inoperative and Does Not Apply to the Claims in This Case.

Nearly three years before Stefánsson stole NetApp's proprietary information and founded a competitor company in violation of the PIIA and state and federal law, he terminated his employment agreement with NetApp Iceland. *See* Dkt. 36-4. Nevertheless, the district court applied that terminated employment agreement's forum-selection clause to resolve disputes that arise exclusively under the PIIA, federal law, or Florida law.

This was clear legal error. Both the construction and enforcement of a forum-selection clause are legal questions reviewed *de novo* by this Court. *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1256 (11th Cir. 2006); *Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1316 (11th Cir. 2013). At the time of Stefánsson's misappropriation, he was an at-will employee living in Florida and working for U.S.-based NetApp, Inc. The employment agreement and the PIIA were never integrated; the employment agreement was (as he admits) terminated by mutual consent; and NetApp, Inc.'s claims fall outside the narrow scope of the employment agreement's forum-selection clause regardless.

### A. The PIIA Is a Separate Contract Independent of the Terminated Employment Agreement.

Stefánsson tells the Court that the two agreements "govern[] the same employment relationship" (at 28), but that is manifestly incorrect. The plain text of the agreements, along with the parties' express, written termination of the Icelandic employment agreement before Stefánsson moved to Florida to work for a U.S. employer, "demonstrat[e] the parties' intent to form two contracts." *In re Gardinier, Inc.*, 831 F.2d 974, 978 (11th Cir. 1987).[1]

#### 1. The Parties Designed the Agreements to Govern Different Relationships.

The very "nature and purpose of the agreements are different." *Gardinier*, 831 F.2d at 976. As elaborated in NetApp, Inc.'s opening brief

[1] Stefánsson tries to distinguish *Gardinier* on its facts (at 29–30), but cannot dispute the principles this Court articulated. This Court determined that "the terms of the instrument demonstrate that the parties intended to make two separate contracts" even though the two contracts were set forth in the *same document*. *Gardinier*, 831 F.2d at 976. Two of the factors relevant in *Gardinier*—that "the nature and purpose of the agreements are different" and that "the obligations of each party to the instrument are not interrelated"—apply here. *See* Opening Br. 25, 30, 36. The latter factor applied *even though* one agreement was "conditioned upon the completion of [a] totally separate agreement[]." *Gardinier*, 831 F.2d at 977–78. Nothing in the Court's analysis of these principles turned on the cosmetic differences between *Gardinier* and this case highlighted by Stefánsson.

(at 30–31), the PIIA is NetApp's general confidentiality and non-solicitation agreement, designed to follow employees across the entire NetApp family of companies to any jurisdiction in which that employee works. Dkt. 1-2 (Preamble); *id.* §§ B, C.1–C.2, G, H. The PIIA sets out Stefánsson's obligations to *all* NetApp entities. *Id.* § A.1 (defining "Company" as "my Employer and each of NetApp, Inc. and its subsidiaries and/or affiliated companies"). It applies uniformly to all NetApp employees and explicitly survives transfers between NetApp affiliates. *Id.* (Preamble); *id.* §§ M, N. And its distinct choice-of-law and forum-selection clause requiring a dispute to be decided according to local law in the location of the breach reflect that reality with a permissive forum-selection clause and a mandatory choice-of-law provision. *Id.* § O.

That is why the PIIA followed Stefánsson when he moved to Florida to work for U.S.-based NetApp, Inc.—the parties designed it that way.[2] So when Stefánsson broke his contractual obligations and violated U.S.

[2] Although irrelevant to the legal question at hand, to the extent Stefánsson suggests (at 5) his move to Florida was temporary, that contradicts the allegations of the complaint (Dkt. 1 ¶ 4) that "he permanently transferred and relocated to Florida," which must be taken as true. *See Samara v. Taylor*, 38 F.4th 141, 152 (11th Cir. 2022).

trade-secret law by stealing NetApp's confidential information and trade secrets, the PIIA—including its own choice-of-law and forum-selection clause—applied in full force.

The same cannot be said of the employment agreement. That agreement served a wholly different function: it defined Stefánsson's specific employment relationship with NetApp Iceland under Icelandic law. *See* Dkt. 36-2 §§ 2, 3, 5–11; *id.* at 1 (defining the parties to the agreement as Greenqloud and Stefánsson).[3] That agreement's choice-of-law and forum-selection clause reinforce the focus on Icelandic employment by selecting Icelandic law and forum for its enforcement. *Id.* § 20.7. And the parties designed the employment agreement to be terminated in full and independently of the "perpetual" PIIA (*id.* § 12.2), notwithstanding

[3] Stefánsson tries to distinguish *Arciniaga v. General Motors Corp.*, 460 F.3d 231 (2d Cir. 2006), on the basis that it involved "different parties" (at 37), but so do the agreements here. The employment agreement was between Stefánsson and NetApp Iceland *only*. Dkt. 36-2 at 1 (defining the "undersigned" as Greenqloud and Stefánsson). The PIIA defined obligations between Stefánsson and *all NetApp entities*, including NetApp Iceland. Dkt. 1-2 § A.1 (defining "Company" as "my Employer and each of NetApp, Inc. and its subsidiaries and/or affiliated companies"). And contrary to Stefánsson's uncited assertion (at 38), NetApp, Inc. has always taken the position that the agreements involve different parties. Dkt. 66 at 14 ("the PIIA and the Icelandic Employment Agreement involve different corporate entities.").

any provision that would allow the agreement to continue to have force post-transfer if it were not terminated (*e.g.*, *id.* § 1.6). But Stefánsson *did* (as he admits at 15) terminate the employment agreement with NetApp Iceland in 2022 upon his move to Florida to work for U.S.-based NetApp, Inc. So three years later, when he began exfiltrating NetApp's proprietary information, the employment agreement (including its Icelandic choice-of-law and forum-selection clause) had no continuing force.

Stefánsson brushes those distinctions to the side with two points, neither persuasive.

He first argues NetApp, Inc. did not invoke the agreements' function below. Stefánsson Br. 28. But NetApp, Inc. clearly argued in its opposition to dismissal that the agreements served different purposes. Dkt. 66 at 3, 11–12. And regardless, parties waive issues, not arguments. *ECB USA, Inc. v. Chubb Ins. Co. of N.J.*, 113 F.4th 1312, 1320 (11th Cir. 2024).

He then offers that the employment agreement and PIIA were contemporaneously executed and "govern the same employment relationship, particularly with respect to intellectual property." Stefánsson Br. 30. But the employment agreement's section dedicated to intellectual

property cites *Icelandic law* as the basis for those obligations, further underscoring its tailoring to Stefánsson's Icelandic employment. Dkt. 36-2 §§ 18.1, 18.3. And that the contracts were "contemporaneously" executed is not dispositive; the contracts in *Gardinier* were executed contemporaneously and conditioned on one another, but were still held independent. *See Gardinier*, 831 F.2d at 976.[4]

### 2. Other Textual Provisions Reinforce that the PIIA Is Independent of the Employment Agreement.

The agreements' defined terms and the employment agreement's omission of the PIIA from its preemptive scope confirm the independence of each agreement.

For starters, each contract defines the term "Agreement" to refer only to itself. The PIIA defines "this 'Agreement'" as the PIIA (Dkt. 1-2 (Preamble)) and separately references "any *employment agreement* or employment offer" (*id.* § M (emphasis added)). The employment agreement, too, defines "Agreement" in reference to that specific agreement

[4] Stefánsson also dismisses NetApp, Inc.'s argument as to the agreements' distinct functions as improperly relying on extrinsic evidence. Stefánsson Br. 2, 28, 36–37. But the agreements' distinctiveness can be gleaned from their four corners—NetApp, Inc.'s declarations only confirmed those distinct designs.

("this Employment Contract," Dkt. 36-2 § 1.2), while separately defining the PIIA as a "pre-boarding document[]" that Stefánsson must sign and as the fount of Stefánsson's confidentiality and non-solicitation obligations (Dkt. 36-2 §§ 12.1, 14.3, 19.2).

The district court impermissibly rewrote those definitions—decapitalizing the word "Agreement" when quoting the text to suggest that the agreements used that term generically. *See* Dkt. 142 at 3, 4, 19, 22, 25, 26. But courts must respect the contract's express definitions, and the district court legally erred in rewriting the contracts. *Fla. Inv. Grp. 100, LLC v. Lafont*, 271 So. 3d 1, 5 (Fla. Dist. Ct. App. 2019) (courts should "strive to interpret a contract based on the definitions contained within the contract").

Stefánsson cannot avoid that error (at 32) by suggesting that NetApp, Inc. waived application of the agreements' definitions. NetApp, Inc. quoted the aforementioned PIIA definition in its opposition to dismissal below. Dkt. 66 at 10, 13. And parties cannot waive a challenge to an issue "addressed" by the district court, as occurred here. *See Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1194 (11th Cir. 2018); Dkt. 142 at 3, 4, 19, 22, 25, 26. In any event, parties cannot "waive the

plain meaning of a word." *ECB USA, Inc.*, 113 F.4th at 1321 (citation omitted). The agreements' definitions merely bolster NetApp's exact position below: the employment agreement's forum-selection clause is irrelevant to the claims presented because, as is clear from the text, the employment agreement and PIIA were separate contracts. *See id.* ("[A] party on appeal can always cite a new authority—such as the canons of construction—in favor of reading a legal text to mean what the party advocated for below.").[5]

Because the parties foresaw potential conflicts between the employment agreement and other NetApp documents, they included an express

---

[5] The cases Stefánsson relies on (at 32–33) to argue otherwise are inapposite. They involved entirely new substantive theories on appeal based on contractual provisions not referenced below. *See OMV Assocs. Ltd. P'ship v. TriMont Real Est. Advisors, Inc.*, 484 F. App'x 299, 305 (11th Cir. 2012) (appellant waived "an unarticulated theory related only at the highest level of abstraction to a party's contentions" before the district court); *Bridge Cap. Invs., II v. Susquehanna Radio Corp.*, 458 F.3d 1212, 1217 n.3 (11th Cir. 2006) (in dispute as to whether permit became "Final Order" under Section 5.4(d) of parties' contract, Susquehanna waived argument on "Section 5.4(d)'s third requirement" because its district court brief "based its argument solely on Section 5.4(d)'s second requirement"); *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1170 (11th Cir. 2004) (finding waiver where Consorcio "argued below that the panel exceeded its authority *under Venezuelan law*; but it did not argue that the panel exceeded its authority *under the language of the contracts* governing which disputes would be arbitrated").

but limited preemption clause: The "terms of this [employment] Agreement . . . will prevail in the event of any conflicts between these terms and any provisions in the NetApp policies, internal rules, guidelines, or regulations." Dkt. 36-2 § 20.4. Additional agreements like the PIIA are absent from the scope of that preemption, revealing that the employment agreement's terms were not intended to supersede the PIIA. *See SE Prop. Holdings, LLC v. Welch*, 65 F.4th 1335, 1344 (11th Cir. 2023) ("the mention of one thing implies the exclusion of another").

Stefánsson's primary substantive response (at 36) to this clear exclusion is that there was "no need" to list the PIIA in this provision because the two agreements were integrated. This of course begs the question. He also suggests that the PIIA could be one of the "policies," "guidelines," or "regulations" in the preemption clause. Stefánsson Br. 35–36. But the PIIA is an *agreement*, not a policy, guideline, or regulation. And where the parties intended to reference the PIIA, they did so expressly—including three clauses earlier in the same section, and as a separate "pre-boarding" document four clauses earlier. *See* Dkt. 36-2 §§ 19.2, 20.1. Here again, Stefánsson cries waiver; but, here again, parties waive issues, not arguments, and the preemption clause is nothing more than

additional textual proof that the employment agreement does not control this dispute. *See ECB USA, Inc.*, 113 F.4th at 1320–21.

### 3. Neither Agreement Expressly Integrates the Other, and Stefánsson's Contrary Reading Renders Many Provisions Meaningless.

Faced with agreements designed to govern different conduct, Stefánsson resorts to constructions that would render many provisions meaningless.

As an initial matter, Stefánsson primarily hangs his theory (at 24–26, 33) on the employment agreement's description of the PIIA as "form[ing] an integral part of this Agreement, together with the signing of this Agreement." Dkt. 36-2 § 14.3. But "integral" is not the same as "integrated"—one agreement may be important to the execution of another agreement without meaning the agreements form a single contract. *Gardinier*, 831 F.2d at 977–78 ("agreements are often conditioned upon the completion of totally separate agreements," but even when "agreements appear in a single document," that "by itself is insufficient to overcome" textual indicators "demonstrat[ing] the parties' intent to form two contracts").

Accepting Stefánsson's construction would violate the basic tenet of contract construction that courts must give "reasonable meaning to all provisions of a contract," rather than rendering provisions "useless." *In re FFS Data, Inc.*, 776 F.3d 1299, 1304 (11th Cir. 2015). Stefánsson's argument in favor of integration provides no work for the PIIA's forum-selection clause because the employment agreement's clause would *always* apply over the PIIA's, even after termination of the employment agreement. It also cannot account for the competing mandatory choice-of-law provisions (the PIIA applying the law of the location of the breach, and the employment agreement applying Icelandic law in all events), the self-referential definitions of each "Agreement," and the distinct references to the PIIA throughout the employment agreement.

There is no need for this Court to read these inconsistencies into the contract. These provisions are easily harmonized by reading "integral part" to mean that the PIIA is important to the employment relationship—not that it merges into the employment agreement and loses all independent force.

Stefánsson next leans on the "entire agreement" clauses in both documents, arguing that the employment agreement's statement that

"this Agreement, including the PIIA, constitutes the entire contract between the Parties" and the PIIA's mirroring language establish that the two documents form one contract. Stefánsson Br. 24–25. But that language only confirms that the employment agreement treats the PIIA as something separate from itself—not as something already subsumed. Dkt. 36-2 § 20.1. If the PIIA were truly part of the "Agreement" as defined, there would be no need to reference it separately multiple times throughout the employment agreement. Dkt. 36-2 §§ 19.2, 20.1.

Nor do the cross-references and mutual contingencies that Stefánsson identifies (at 24–26, 33) compel integration. Again, referencing another agreement and conditioning employment on its execution is not the same as merging two contracts into one. *Gardinier*, 831 F.2d at 977–78. If anything, the very need for the employment agreement to direct Stefánsson to the PIIA for his confidentiality obligations underscores that those obligations reside in a separate instrument.[6] Stefánsson's argument (at 30, 34) that the PIIA "shall not supersede [other Greenqloud

[6] The cases Stefánsson relies on (at 25), such as *Clayton v. Howard Johnson Franchise Systems, Inc.*, 954 F.2d 645, 649 (11th Cir. 1992), and *Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1341 (11th Cir. 2019), do not help him. They at most stand for the general proposition that

acquisition] covenants" is irrelevant; NetApp, Inc. does not argue that the PIIA's provisions "supersede" the employment agreement's, but that the agreements must be interpreted to give effect to each.

The most reasonable reading of these two agreements is that the parties intended each to operate independently. The district court thus erred by merging them and applying the terminated employment agreement's forum-selection clause to dismiss NetApp, Inc.'s claims under the PIIA and state and federal statutes.

### B. The Icelandic Forum-Selection Clause Terminated with the Employment Agreement.

It is undisputed that the employment agreement terminated in December 2022. Its forum-selection clause—which lacks any survival language—terminated along with it. The PIIA, by contrast, survived and continues to govern Stefánsson's obligations. When one agreement terminates and another survives, the surviving agreement's forum-selection

cross-references between contracts *may* suggest interdependency. Neither holds that cross-references alone can override myriad textual indicators demonstrating the parties' intent to maintain two separate agreements, because neither involved contrary textual indicators like those present here.

clause controls. So even if the contracts were integrated during his Icelandic employment (they were not), the parties' termination of that Icelandic employment agreement upon Stefánsson's acceptance of an at-will position with a U.S. employer means that its defunct forum-selection clause holds no weight here, and the district court erred by holding otherwise.

1. In December 2022, before the launch of Red Stapler and any of the conduct at issue in this suit, Stefánsson and NetApp Iceland "terminate[d]" the employment agreement "by mutual consent." Dkt. 36-4; Stefánsson Br. 15. The employment agreement itself specifies precisely which obligations survive that termination. It provides that Stefánsson's obligations under the PIIA—to which it refers for his confidentiality obligations—are "perpetual and shall survive." Dkt. 36-2 § 12.2. It further provides that the non-solicitation and non-competition clauses survive for a period of "1 year" after termination. *Id.* §§ 13.1, 14.1. The employment agreement's forum-selection clause, though, lacks a survival clause. *Id.* § 20.7.

This omission is dispositive. Florida courts read contracts with a presumption "that every provision was intended to accomplish some purpose, and that none are deemed superfluous." *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 742 (11th Cir. 2024). To hold that the forum-selection clause survived would "render meaningless" the survival clauses, which enumerate the parties' choices for effective provisions post-termination. *Polyflow, LLC v. Specialty RTP, LLC*, 2016 WL 6909383, at *7 (S.D. Tex. May 17, 2016).[7] The logic is straightforward: if the parties wanted a provision to survive termination, they said so expressly, and the forum-selection clause was not enumerated for preservation.

Similarly, adopting Stefánsson's argument renders meaningless the PIIA's forum-selection clause. If—as Stefánsson argues—the terminated employment agreement's Icelandic forum-selection clause continued to apply to all disputes even after termination, the PIIA's carefully

[7] Stefánsson contends (at 35) that NetApp, Inc. cites "no authority" holding that termination of an agreement can terminate the forum-selection clause. But NetApp, Inc. cited (at 39 & n.6) several cases, like *Polyflow*, holding that a forum-selection clause terminated with its underlying agreement, which Stefánsson does not distinguish.

crafted, floating forum-selection clause would never have any operative effect. But "well-settled" Florida law requires courts to harmonize provisions to give effect to each of them when possible (as here). *Holmes v. Fla. A & M Univ.*, 260 So. 3d 400, 405 (Fla. Dist. Ct. App. 2018).

Nowhere does Stefánsson attempt to harmonize the two forum-selection clause provisions, instead assuming that the PIIA's clause is deadweight. But a sensible reading that gives effect to all provisions is that the Icelandic employment agreement's Icelandic forum-selection clause terminated with Stefánsson's NetApp Iceland employment, and the PIIA's floating forum-selection clause (at minimum) applied thereafter to claims arising under its terms—like the breach claims asserted here.

2. Stefánsson does not dispute that the employment agreement lacks survival language for its forum-selection clause. Instead, he incorrectly contends NetApp, Inc. conceded in the district court that the clause survived and that the clause survives even without a survival clause. *See* Stefánsson Br. 43–47. He is wrong on both scores.

As an initial matter, NetApp, Inc. never agreed that the employment agreement's forum-selection clause survived the parties' termination of that agreement. *Contra* Stefánsson Br. 46–47. Counsel for NetApp, Inc. stated *only* that the employment agreement's forum-selection clause may survive as to a "dispute about union rights" or other issue "related to [Stefánsson's] Icelandic employment"—disputes not relevant here. Dkt. 105 at 34:24–35:2. These are examples of claims *related to Stefánsson's Icelandic employment*. This case, by contrast, concerns misappropriation by a U.S. employee working for a U.S. employer while living in Florida, and does not involve Stefánsson's Icelandic employment whatsoever.

Nor can Stefánsson recharacterize (at 43–45) the forum-selection clause as a "structural provision[]" that "inherently" survives contract termination such that it applies to disputes arising from post-termination conduct. Courts that apply forum-selection clauses *post*-termination do so to avoid uncertainty for disputes over *pre*-termination conduct. *See Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 857–58 (11th Cir. 2016) (remedial provisions "may survive" termination where termination would leave "uncertainty" as to the law that would apply);

*Fla. PACE Funding Agency v. Pinellas Cnty.*, 385 So. 3d 631, 638–39 (Fla. Dist. Ct. App. 2024) (a forum-selection clause "may survive" to fill in a gap for "dispute resolution" that might otherwise exist).[8] No uncertainty exists here. This case involves post-termination conduct, the PIIA remains in effect, so its forum-selection clause governs this dispute. Consequently, the PIIA's clause "overcome[s]" any presumption that the employment agreement's forum-selection clause survived without a survival clause. *NuCurrent Inc. v. Samsung Elecs. Co., Ltd.*, 2019 WL 2776950, at *4–5 (S.D.N.Y. July 2, 2019).

At bottom, the only reading that gives effect to both provisions is the one NetApp advances: The employment agreement's clause applied to disputes concerning that agreement during its term, and when the parties terminated that agreement, its forum-selection clause terminated with it.

---

[8] Stefánsson's remaining cases (at 45–46) concerned only one forum-selection clause, not a terminated clause and a surviving one. *See United States v. Cincinnati Ins. Co.*, 2022 WL 1801193, at *2–3 (M.D. Fla. Mar. 25, 2022); *Sensify (US) Inc. v. Intelligent Telematics N. Am., Inc.*, 2017 WL 1541424, at *2 (S.D. Fla. Apr. 28, 2017).

### C. None of NetApp, Inc.'s Claims Fall Within the Terminated Employment Agreement's Forum-Selection Clause.

Even if the employment agreement and PIIA were integrated contracts *and* the employment agreement's forum-selection clause survived termination, NetApp, Inc.'s claims still would not fall within the scope of the terminated employment agreement's forum-selection clause.

1. The scope of the employment agreement's forum-selection clause is limited by its plain text: it applies only to the "construction, performance, interpretation and validity *of this Agreement*." Dkt. 36-2 § 20.7 (emphasis added). As explained above, the employment agreement expressly defines "this Agreement" as "this Employment Contract," meaning the employment agreement itself. *Id.* § 1.2. Neither NetApp, Inc.'s claims for breach of the PIIA nor Florida or U.S. statutory-trade secret law fall within that narrow scope. *See* Opening Br. at 45 (citing Dkt. 1 ¶¶ 44–113).

Stefánsson tries to side-step the plain text of the specific agreements at issue by imploring the Court to consider the broader themes of "Stefánsson's employment with NetApp" and "the parties' contractual relationship." Stefánsson Br. 47–48. But a forum-selection clause does not

apply simply because of the "relationship between the parties." *Milstein v. Nicklaus*, 412 So. 3d 802, 806–07 (Fla. Dist. Ct. App. 2025) (declining to apply a mandatory forum-selection clause from one agreement to "all disputes between the parties" when doing so "would render the other three contemporaneous agreements" with their "differing forum selection clauses" "equally meaningless").[9] Instead, this Court has been clear: "the language of the clause" "determine[s] if a claim falls within [its] scope." *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1340 (11th Cir. 2012).

And here, the language of the employment agreement's forum-selection clause does not turn on the relationship of the parties; instead, it governs a very specific set of claims—those implicating the "construction, performance, interpretation and validity *of this Agreement*," *i.e.*, the employment agreement. Dkt. 36-2 § 20.7 (emphasis added); *see* Dkt. 1-2 § O (the PIIA's clause applying more broadly to "*any* lawsuit . . . arising from

---

[9] Stefánsson's attempt to distinguish *Milstein* (at 30–31) as involving multiple contracts with multiple forum-selection clauses and no integration language simply begs the question while confirming its applicability. After all, the parties dispute the application of two agreements, with distinct choice-of-law and forum-selection clauses and with no express integration language.

or *related to*" the PIIA) (emphasis added). Neither NetApp, Inc.'s claims for breach of the PIIA nor its trade-secret claims "require reference to or construction of the [employment agreement]" itself. *Milstein*, 412 So. 3d at 807–08 ("Even in contracts containing broad forum selection clauses," a "nexus" does not exist where there's no "rel[iance] on" or "refer[ence] to any provision within that agreement"). So the district court was wrong to conclude these claims fall within the scope of the employment agreement's narrow forum-selection clause.

That is what sets this forum-selection clause apart from the clause this Court addressed in *Slater v. Energy Services Group International, Inc.*, 634 F.3d 1326, 1328–31 (11th Cir. 2011) (concluding that the broad language of a forum-selection clause capturing "all claims . . . *relating to* or arising from this Agreement" covered some statutory claims, too) (emphasis added), and the other cases Stefánsson cites (at 51). *See Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1067–71 (11th Cir. 1987) (non-contractual claims captured by a forum-selection clause covering "any case or controversy arising under or *in connection* with this Agreement") (emphasis added); *Baker v. Econ. Rsch. Servs. Inc.*, 242 So. 3d 450, 453,

455 (Fla. Dist. Ct. App. 2018) (using a "nexus" test to hold a forum-selection clause captured common-law claims "arising out of or relating" to the relevant agreements).

2. At minimum, NetApp, Inc.'s *statutory trade-secret* claims certainly do not depend on the "construction, performance, interpretation and validity" of the employment agreement, nor even the PIIA. As Stefánsson concedes (at 53 n.13), these statutory trade-secret claims can be proven without resort to any contract whatsoever. *See* Opening Br. at 46 (citing *Werner Enters., Inc. v. Mendez*, 362 So. 3d 278, 282 (Fla. Dist. Ct. App. 2023)); *see* Stefánsson Br. 53 n.13 (calling "uncontroversial" the "principle" that a "trade secrets claim can be brought, even when there is no contractual nondisclosure obligation").

In short, even if the two agreements are integrated (they are not), and even if the Icelandic agreement remains in force (it does not), and even if the employment agreement's forum-selection clause applied to a breach of the PIIA (it does not), this Court should still reverse the district court and allow at least NetApp, Inc.'s statutory trade-secret claims to proceed. Nothing in the court's order justifies dismissing those claims, and nothing in Stefánsson's brief does either.

## II. The District Court and Stefánsson Apply the Wrong Legal Standard for *Forum Non Conveniens*.

The district court applied the wrong standard in its *forum non conveniens* analysis because it had incorrectly concluded that the mandatory Icelandic forum-selection clause from the terminated employment agreement applied to NetApp, Inc.'s claims. *See* Dkt. 142 at 35 (erroneously applying the framework for mandatory clauses set forth in *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013)). The district court's "appli[cation of] the wrong legal standard" independently requires reversal. *AQuate II LLC v. Myers*, 100 F.4th 1316, 1320, 1325 (11th Cir. 2024).

Because no mandatory forum-selection clause applies, the burden of persuasion lies with Stefánsson, and the relevant legal question is whether he has demonstrated the kind of "unusually extreme circumstances" and "material injustice" that this Court requires to carry his "heavy burden [of] opposing the [domestic NetApp, Inc.'s] chosen forum" in Florida. *Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1339 (11th Cir. 2020) (citations omitted).

Stefánsson does not shoulder that burden in response because he (like the district court) clings (at 54–64) to the erroneous notion that the

terminated employment agreement's forum-selection clause applies. To be sure, he evaluates some of the relevant factors through the irrelevant *Atlantic Marine* framework governing mandatory forum-selection clauses. But even spotting him those arguments, he cannot carry his heavy burden.

And, in all events, even if the mandatory clause applied, it would be unreasonable, unfair, and unjust to apply it to the federal and state statutory misappropriation claims, because NetApp, Inc. cannot obtain effective relief for those claims in Iceland. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 17–18 (1972).

### A. Stefánsson Has Not Shouldered His Burden to Demonstrate that Litigating in Florida Would Be a "Material Injustice."

In the absence of a mandatory forum-selection clause, "a *forum non conveniens* dismissal is subject to three conditions." *Otto Candies*, 963 F.3d at 1338. The defendant "must demonstrate that (1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *Leon v. Millon*

*Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001). Stefánsson carries his burden on none.

Stefánsson does not meaningfully dispute that venue is proper in Florida absent application of the terminated employment agreement's Icelandic forum-selection clause. Almost all the public and private interests Stefánsson invokes *depend on* the application of the Icelandic forum-selection and choice-of-law provisions from the terminated employment agreement.

Once those irrelevant interests fall away, however, the only "public and private" interests that even arguably remain are that he and his cohort now reside in Iceland (where Red Stapler is registered), and that (contrary to the complaint's allegations) his alleged misconduct occurred in Iceland. *See* Stefánsson Br. 60–62; *but see* Dkt. 1 ¶¶ 11, 16, 20–21, 32–33. But neither the current residences of some (not all) parties and witnesses nor a disagreement with the complaint's factual allegations are the kind of disproportionate "vexation and oppressiveness" necessary to overcome plaintiff NetApp, Inc.'s choice of forum. *Otto Candies*, 963 F.3d at 1338–39; *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica,*

*S.A.*, 382 F.3d 1097, 1102 (11th Cir. 2004) (dismissal for *forum non conveniens* was abuse of discretion even though key witnesses were located in Spain).

Stefánsson's arguments as to prejudice likewise depend almost entirely on the false premise of the employment agreement's continued application. But Stefánsson "agreed" to terminate the only contract *requiring* an Icelandic forum years before this dispute arose. Stefánsson Br. 15; *see* Dkt. 36-4. And because Stefánsson breached the PIIA while employed by U.S.-based NetApp, Inc. in Florida, the PIIA's mandatory choice-of-law provision demands that federal and Florida law apply to the PIIA claim. Dkt. 1-2 § O. Stefánsson also breached federal and Florida law while employed by NetApp, Inc. in Florida; obviously, federal and Florida law governs those statutory claims, too.

Moreover, the prejudice to NetApp, Inc. of having its case—particularly its statutory trade-secret claims—kicked to a foreign forum cannot be understated. Icelandic procedural law lacks several mechanisms and remedies crucial for a fast-moving case involving the misappropriation of trade secrets to its direct competitor, including not providing for a "gen-

eral system of discovery," for third-party discovery, for "a declaratory ruling on parties' rights and obligations . . . within a short timeframe," or for preliminary injunctions that "entail a declaration of the applicant's rights." Dkt. 66-3 ¶¶ 18–26. The lack of these procedural mechanisms will either delay or entirely prevent NetApp, Inc.'s ability to secure a remedy against Stefánsson.[10]

### B. It Would Be Unreasonable to Apply the Icelandic Clause to the Statutory Claims.

At a minimum, it would be "unfair, unreasonable, or unjust" to apply the Icelandic forum-selection clause to the DTSA and FUTSA claims. *M/S Bremen*, 407 U.S. at 17–18. As explained above and in the district

[10] Stefánsson mistakes NetApp, Inc.'s arguments as to prejudice as new arguments on the adequacy of Iceland as a forum. Stefánsson Br. 56–57. But this argument is not new. *See* Dkt. 66 at 20 (arguing that reinstating the suit in Iceland would cause NetApp undue prejudice because "discovery and provisional relief mechanisms are limited in Iceland, but such mechanisms are critical in trade secrets cases" and "third-party discovery does not exist in Iceland") (citing Dkt. 66-3). Any acknowledgment below about the general adequacy of Iceland as a forum is not a "concession" (*contra* Stefánsson Br. 57) that dismissal was warranted in this suit. In *Otto Candies*, this Court reversed a dismissal for *forum non conveniens* even though the plaintiffs did not challenge the district court's conclusions that "Mexico was an adequate and available alternative forum, and that the plaintiffs would not be subject to undue inconvenience or delay if they had to refile there." 963 F.3d at 1338 n.1.

court, any trade-secret claim that NetApp, Inc. could assert under Icelandic law would not provide NetApp, Inc. "effective relief for misappropriation affecting U.S. operations." Dkt. 66-3 ¶ 18. "[T]he two legal systems vastly differ when it comes to discovery and provisional relief mechanisms which may be critical in the significant challenges to gather evidence in trade secret disputes" (*id.* ¶ 20), and effective relief for NetApp, Inc. "may require U.S. statutory and equitable tools (e.g., DTSA remedies and United States' courts' discovery tools), favoring adjudication where evidence, third parties, and market injury are located" (*id.* ¶ 18).[11]

The trade secrets at issue in this dispute are central to NetApp, Inc.'s competitive advantage. While employed by NetApp, Inc. in Florida, Stefánsson exploited his knowledge of NetApp's trade secrets and confidential information to launch Red Stapler, which he sold to NetApp's direct competitor (VAST Data) shortly after leaving NetApp, Inc. *See* Dkt.

[11] Stefánsson again wrongly describes (at 57–58) this argument as forfeited. But the district court's dismissal order addressed whether enforcement of the Icelandic forum-selection clause "would be unfair or unreasonable." *See* Dkt. 142 at 35–38. And "[t]here can be no forfeiture where the district court nevertheless addressed the merits of the issue." *Hi-Tech Pharm., Inc.*, 910 F.3d at 1194 (citation and internal quotation marks omitted).

1 ¶¶ 36–39.

Although Stefánsson insists that VAST's purchase of Red Stapler was nothing more than an "acqui-hire" (Stefánsson Br. 6), NetApp, Inc.'s complaint and the record support a different narrative. VAST Data's press release announced that the acquisition included "[Red Stapler's] cloud control plane and service delivery platform." Dkt. 1 ¶ 8. Stefánsson himself referenced the sale of "the Polaris [extensible] delivery service platform IP" in a contemporaneous response to a press inquiry. Dkt. 126 at 196:17–198:7. Stefánsson and his team used a Red Stapler GitHub repository to hold their cloud extensibility experiments and other code while still employed with NetApp. *Id.* at 249:6–21, 251:8–13. And Stefánsson and his Red Stapler team took countermeasures to cover the extent of their wrongdoing, including deleting the copied files from their NetApp laptops, resetting their devices to factory settings, and transferring their profiles to external hard drives before they resigned. *See* Opening Br. at 18–19.

Effective relief for NetApp, Inc. will depend on the kind of enforceable discovery mechanisms and injunctive relief available in Florida—and not Iceland. The relevant documentary proof NetApp, Inc. might

need to prove its claims are in the hands of Stefánsson, his fellow Red Stapler team members, and VAST Data. But Iceland has "no general system of discovery" and parties are "free to determine which evidence they submit"; a party who refuses to produce a requested document is subject only to the "limited mechanism" of a potential adverse inference. Dkt. 66-3 ¶¶ 21–22. In fact, it is "not possible to seek third-party discovery in the Icelandic legal system." *Id.* ¶ 24. And although the successful integration of NetApp's trade secrets into its competitor's technology is exigent for NetApp's business, "it is not possible to obtain a declaratory ruling on parties' rights and obligations from an Icelandic court within a short timeframe." *Id.*¶ 25.

## CONCLUSION

The Court should reverse the district court's order of dismissal and remand for further proceedings.

Dated: May 13, 2026

Respectfully submitted,

*/s/ Blaine H. Evanson*

Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Suite 1200
Irvine, CA 92612
(949) 451-3800
*bevanson@gibsondunn.com*

Elizabeth A. Kiernan
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
(214) 698-3100

Katherine K. Vidal
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
(202) 282-5000

Aly Cox
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500

*Counsel for Appellant NetApp, Inc.*

## CERTIFICATE OF COMPLIANCE

**1. Type Volume**

__X__ This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 6,415 words.

**2. Typeface and Type Style**

__X__ This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point, New Century Schoolbook font.

Dated: May 13, 2026

Respectfully submitted,

*/s/ Blaine H. Evanson*
Blaine H. Evanson

*Counsel for Appellant*
*NetApp, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of May 2026, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

Dated: May 13, 2026

Respectfully submitted,

*/s/ Blaine H. Evanson*
Blaine H. Evanson

*Counsel for Appellant NetApp, Inc.*